**Charles EVANS, et al.,**
**(Appellants/Cross–Appellees),**

**v.**

**Thomas R. POLLOCK, et al.,**
**(Appellees/Cross–Appellants).**

**No. 3–86–068–CV.**

Court of Appeals of Texas,
Austin.

March 15, 1989.

Rehearing Overruled June 21, 1989.

Ordered Published by Supreme Court
of Texas June 13, 1990.

Mark L. Perlmutter, Doggett, Jacks, Marston & Perlmutter, P.C., Jim Arnold, Jr., Arnold, Crook and Associates, Austin, for appellants/cross-appellees, Charles Evans, et al.

Elizabeth G. Bloch, Hilgers & Watkins, P.C., Austin, for appellants/cross-appellees, Joan Hornsby Johnson, et al.

Steve Selby, Scott, Douglass & Luton, Austin, for appellant/cross-appellee, Thomas R. Pollock.

Steve Selby, Scott, Douglass & Luton, Austin, for appellee/cross-appellant, Thomas R. Pollock.

Before SHANNON, C.J., and BRADY and ABOUSSIE, JJ.

ABOUSSIE, Justice.

Charles Evans and other persons who owned property within a subdivision brought this action for declaratory judgment and injunctive relief, requesting that the trial court declare that all property located within a subdivision is subject to restrictive limitations on its use and seeking to enjoin an owner from transferring his land in violation of the restrictions. Trial was to the court, which found that the restrictive covenants in issue applied only to a portion of the subdivision, not to the entire tract. All parties appeal. We will reverse the judgment.

Stanley and Sarah Agnes Hornsby owned real property fronting on Lake Travis together with Charles and Bernice McCormick. On or about September 11, 1947, the Hornsbys and the McCormicks established a subdivision, which included their commonly owned property, that they named "Beby's Ranch Subdivision No. 1." The plat did not contain any land-use restrictions or limit permissible use of the property in any way.

The plat of Beby's No. 1 designated seven blocks labelled "A" through "G." Blocks A, B, and G were divided into thirty-one lots. Those blocks designated C, D, E, and F were not further subdivided. The subdivision is on a peninsula-like tract that extends into the lake, so that much of it has lake frontage. Block G is situated on the point. Block F is situated on a hill surrounded by lake-front lots in the subdivision.

Before creating the subdivision, the McCormicks conveyed two lake-front lots they owned to Frank Holloway, one in April 1946 and the second in July 1947. The first lot was conveyed unburdened by any of the deed restrictions here in issue. The 1947 deed prohibited any business or commercial enterprise on the second lot. When Holloway conveyed these two lots to third parties in 1954, he provided by deed that the property could not be used for any business or commercial purpose and that the restrictions could be altered by the so-called "¾ vote" discussed below. Neither lot ever has been expressly restricted

to residential use. The record does not reflect that Holloway had any connection with the subdivision, and no one suggests that any rules governing the subdivision control this property, but Holloway's lots were carved out of property which later was included in the subdivision and are situated between Block A and Block G.

In 1948, the McCormicks also created an adjacent subdivision containing eleven lots, solely owned by them, that they called "Beby's Ranch Subdivision No. 3." There were no land-use restrictions expressly attached to this subdivision.

By deed dated October 17, 1947, before selling any lots, the Hornsbys and the McCormicks partitioned Beby's No. 1 between them. The McCormicks acquired title to all of Blocks A, B, and C, and the Hornsbys acquired title to all of Blocks D, E, F, and G. The partition deed did not include any agreement or covenants restricting use of land within the subdivision, and no restrictions were ever filed of record.

Over the next several years, the Hornsbys and the McCormicks conveyed twenty-nine parcels of property within Beby's No. 1 to third parties or to one another. Hornsby, a real estate lawyer, and his law partner Louise Kirk, handled most of the legal work relating to the sale of lots, although the McCormicks made most of the sales. A real estate agent, Bill Grafton, advertised some of the property for sale in 1955. The McCormicks made thirteen conveyances before 1950 (including one to the Hornsbys), two in 1950, and seven between 1955 and 1957; a total of twenty-two over ten years. In 1958, they sold Block C. The McCormicks also transferred nine lots from 1948 to 1950, one in 1953, and the last in 1955, all out of Beby's No. 3.

On the same date as the partition deed, the Hornsbys conveyed a lot on the point to their daughter. In 1948, they transferred two lots, one to the McCormicks and one to Kirk. The Hornsbys made no further conveyances until selling a lot to the Arnolds in 1957. They executed three more deeds in 1957, one in 1958, and one in 1969; a total of nine over twenty-two years.

Each deed from the McCormicks and the Hornsbys contained the following similar terms: (1) prohibiting business or commercial use of the land conveyed, (2) restricting it to residential use with only one dwelling, and (3) providing that the restrictions could be changed by ¾ of the property owners within the subdivision "voting according to front footage holdings on the 715 contour line" of the lake. These restrictions are those which are in issue. None of the deeds provided that similar restrictions govern all or any other part of the subdivision or that like covenants would be included in any deeds to subdivision property in the future.

Since the partition in 1947, the Hornsbys have retained ownership of lots 4 through 8 in Block G and all of Block F. It is this property which gave rise to this dispute. Both of the Hornsbys are now deceased; the action was brought against their devisees of the so-called "retained" property.

The dispute arose when the Hornsby devisees contracted with Thomas R. Pollock to sell him all of Block F and lots 4 and 5 in Block G for the purpose of building a marina, private club, and condominium development. Evans and several owners whose deeds limit the use of their property sought equitable relief, requesting the trial court to declare the subdivision restricted. The Evans appellants alleged that the restrictive covenants expressly imposed by deed upon their property were by implication impressed upon the entire subdivision, including all the land retained by the Hornsbys. They rely upon the doctrine of implied reciprocal negative easements.

The trial court declared that the covenants in issue bind all lake-front property in the subdivision, including the Hornsbys' five retained lots on the point, but they do not restrict Block F, the hilltop, which contains about nine and one-half acres but has no lake frontage. All parties appeal from the trial court's judgment. The Evans appellants challenge the trial court's exclusion of Block F from its ruling, and the Hornsby devisees and Pollock challenge the imposition of restrictions upon the lots in

Block G and the granting of an injunction as to those lots.

■■■■ As a general rule, parties are free to agree among themselves concerning restrictions on property that is the subject of a sale and to include these covenants in any deed of conveyance, so long as they comport with public policy and are not otherwise illegal. *Curlee v. Walker,* 112 Tex. 40, 244 S.W. 497, 498 (1922). Covenants in a deed generally are considered personal to the parties concerned, relate only to the property described therein, and may be enforced only between parties to the conveyance. *Green v. Gerner,* 289 S.W. 999 (Tex. 1927). Restrictions imposed upon separate grantees of lots in a subdivision pursuant to a general plan of development may be enforceable by one grantee against another on the theory of mutual covenant and consideration, *Painter v. MacDonald,* 427 S.W.2d 127, 134 (Tex.Civ.App.1968), *rev'd on other grounds,* 441 S.W.2d 179 (Tex. 1969), and upon the ground that mutual negative easements are thereby created to which all grantees are subject. *Braswell v. Woods,* 199 S.W.2d 253, 255 (Tex.Civ. App.1947, writ ref'd n.r.e.). In the same way, a grantee may be able to compel his grantor to adhere to the original development scheme by likewise restricting the property the grantor retains or conveys to others thereafter. *Burgess v. Putnam,* 464 S.W.2d 698 (Tex.Civ.App.1971, writ dism'd). This resulting limitation is commonly referred to as a reciprocal negative easement.

■■■ The doctrine of reciprocal negative easements has been stated generally as follows:

[W]here a common grantor develops a tract of land for sale in lots and pursues a course of conduct which indicates that he intends to inaugurate a general scheme or plan of development for the benefit of himself and the purchasers of the various lots, and by numerous conveyances inserts in the deeds substantially uniform restrictions, conditions and covenants against the use of the property, the grantees acquire by implication an equitable right, variously referred to as an implied reciprocal negative easement or an equitable servitude, to enforce similar restrictions against that part of the tract retained by the grantor or subsequently sold without the restrictions to a purchaser with actual or constructive notice of the restrictions and covenants (citations omitted).

*Minner v. City of Lynchburg,* 204 Va. 180, 129 S.E.2d 673, 679 (1963). The resulting servitude is mutual; "it runs with the land sold by virtue of express fastening and abides with the land retained...." *Sanborn v. McLean,* 233 Mich. 227, 206 N.W. 496, 497 (1925). The imposition of such easements is never retroactive and, therefore, cannot arise due to developing conditions, but instead must originate with the common owner while the property is in his hands. *Id.* Texas has also recognized the doctrine of implied reciprocal negative easements. *Saccomanno v. Farb,* ·492 S.W.2d 709 (Tex.Civ.App.1973, writ ref'd n.r.e.); *Curlee,* 244 S.W. 497; *Hooper v. Lottman,* 171 S.W. 270 (Tex.Civ.1914, no writ).

■■ In order to establish a reciprocal negative easement, there must have been a common owner of a tract or related parcels of land (the original tract). By means of conveyance of a parcel or parcels of land out of this original tract, the common owner must have imposed upon the land he conveyed certain restrictions for the benefit of the land he retained. The grantor's restriction of the land conveyed must have been part of his general scheme or plan of development that the entire original tract should be similarly restricted and thus benefitted; and, once the plan has been effectively placed into operation, the law reciprocally imposes upon the land the grantor retains the same restrictions he expressly placed upon the land conveyed. *Saccomanno,* 492 S.W.2d at 713.

■■■ A reciprocal negative easement can result not only from the language of the deeds, but also from the conduct of the parties or other circumstances surrounding the conveyance. It arises, if at all, out of the benefit accorded to the land the common grantor retained due to the restric-

tions he placed upon the land he carved out of his original tract and sold. *Id.* An easement may be implied when it is shown that a common grantor of all the property adopted a scheme of development which induced purchasers to acquire their land upon the belief that it would all be similarly restricted. *Curlee,* 244 S.W. at 498. The intent to create such a plan must be plain and unmistakable. *Saccomanno,* 492 S.W.2d at 713. It should be applied with "extreme caution" as it results in imposing limitations on an owner's property by implication. *Id.* Application of the doctrine also must be viewed in light of the general rule that all doubts should be resolved in favor of the free and unrestrained use of property and against restrictions. *Baker v. Henderson,* 137 Tex. 266, 153 S.W.2d 465 (1941).

If, from the language of the deeds and in light of the conduct of the parties and other surrounding circumstances, the covenants are found to have been for the benefit of the entire land, evidencing a common scheme of development for all the property, then the entire land, so situated, will be burdened with the restrictions. *Curlee,* 244 S.W. 497; *Bethea v. Lockhart,* 127 S.W.2d 1029, 1031 (Tex.Civ.App.1939, writ ref'd); *Hooper,* 171 S.W. 270; *see also Sanborn,* 206 N.W. 496. The general scheme must have existed at the time of the inception of the development. *Davis v. Huey,* 620 S.W.2d 561, 568 (Tex.1981).

The Evans appellants sought to apply the doctrine to Beby's No. 1 and its original subdividers, the Hornsbys and the McCormicks, as well as to Beby's No. 3. The evidence concentrated upon Stanley Hornsby's intent, conduct, and representations over the years.

■ Application of the doctrine to these facts is awkward at best. The Hornsbys and the McCormicks were common owners of Beby's No. 1 at the time it was created, but all conveyances were made by one or the other couple after partition. Therefore, any plan must have been created by the common owners before partition and implemented thereafter in compliance. At the same time, due to the ¾ vote provision,

anyone who owned lake lots comprising more than ¼ of the property on the 715 contour line controlled the right to change the plan. The record does not reflect that any vote was ever taken.

■ In order to impose a negative reciprocal easement, the Evans appellants had to prove that the common owners established and instituted a general plan of development for the subdivision. Placing similar restrictions in numerous deeds of conveyance by itself does not raise any factual or legal presumption of intent to create a building scheme sufficient to impose an implied negative easement on otherwise unrestricted property. *Cambridge Shores Homeowners Association v. Spring Valley Lodge Co.,* 422 S.W.2d 10, 12 (Tex.Civ.App.1967, no writ). But that fact, coupled with representations which induce purchasers to pay an enhanced price for property in reliance on the common owner's representation that all future conveyances will be similarly restricted in accordance with the declared development plan is a surrounding circumstance which can give rise to a right to equitable relief. *Burgess,* 464 S.W.2d 698.

As the Evans appellants state in their brief, "the restrictions must be part of a general scheme or plan of development for the *entire* tract on which restrictions are sought to be enforced (emphasis added)." The trial court found that the original subdividers, Stanley and Sarah Agnes Hornsby and Charles and Bernice McCormick, who were the common owners of Beby's No. 1, did have a general plan for development of their subdivision which included preservation of its residential character. The *plan,* however, was found to be *that all lakefront property within the subdivision be burdened with the same restrictions.* Finding of fact 19 states as follows:

> The general plan of development of the original subdividers (Stanley and Sarah Agnes Hornsby, Charles and Bernice McCormick) was that all lakefront property within the subdivision be burdened with the same restrictions.

Finding of fact 19 is not challenged by the Evans appellants on appeal and is bind-

ing on them and on this Court. *Gifford v. Ft. Worth D.C. Ry. Co.*, 151 Tex. 282, 249 S.W.2d 190, 193 (1952); *Gibbs v. Greenwood*, 651 S.W.2d 377, 380 (Tex.App.1983, no writ). By this finding, the Evans appellants concede that "the trial court found that the scope of the general plan of development covered only the lakefront lots." It is the scope of the plan which defeats application of the doctrine.

The trial court failed to find that the common owners' actual plan included any subdivision property without lake frontage, such as Block F. Therefore, the trial court impliedly found that the common owners did not have a plan which included the entire subdivision.

The trial court further found that Hornsby and his agent *represented* to various purchasers that *all lakefront parcels were restricted,* a representation which would be consistent with the common owners' actual plan. Finding of fact 20 states as follows:

> Stanley Hornsby and his real estate broker represented to various purchasers that all lakefront parcels (i.e. all parcels except Block F) were restricted to residential use only and that business-commercial use thereof was prohibited.

The trial court failed to find, however, that Hornsby represented that the hilltop was restricted.

Based upon the facts it found, the trial court concluded that the restrictions in issue were binding upon all the subdivision parcels except Block F. By its judgment, the trial court impliedly concluded that a common owners' requisite general plan of development need not include all of his original tract in order for a reciprocal negative easement to attach to a portion of it. We are cited to no authority which supports this proposition, and we hold otherwise.

The Evans appellants contend that the existence of a common owners' general plan of development can be established through proof of either his actual or his apparent intent to create such a plan. Intent is clearly a fact question. They do not challenge the finding that the developers' actual intent was to restrict the lakefront

lots (though the Hornsby devisees and Pollock do) and admit that there was some evidence which could support this fact. They also admit that there was some evidence that Hornsby's actual intent was to restrict only the lake lots, not the hilltop. However, they challenge the trial court's finding concerning Hornsby's representations to purchasers regarding Block F. They rely on these representations as proof of his apparent intent to restrict the entire subdivision, and claim that these representations alone permit the equitable relief sought.

■ The Evans appellants complain that the trial court's failure to find that Hornsby and his real estate agent represented to purchasers that Block F was restricted (and implied finding otherwise) is against the great weight and preponderance of the evidence, and could only be based upon incompetent evidence erroneously admitted and, further, that they conclusively proved that Hornsby made affirmative representations to purchasers that the hilltop was in fact restricted. The issue was one on which the Evans appellants had the burden of proof. Where a party has the burden to prove a fact, no evidence is required to support its nonexistence and to permit a negative finding on the issue. *Bell v. Buddies Super–Market,* 516 S.W.2d 447 (Tex.Civ.App.1974, writ ref'd n.r.e.).

■ In reviewing a legal sufficiency point, the court will consider only evidence and reasonable inferences drawn from that evidence in the light most favorable to the verdict, disregarding all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965). We may sustain the challenge only if, after examining all the evidence, we determine that there is no probative evidence to support the fact found and further find that appellants established the contrary as a matter of law. *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex. 1982). We may sustain a point of error challenging the factual sufficiency of the evidence only if, after considering all the evidence, we determine that the trial court's finding is so against the great

weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *see* Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Texas L.Rev. 361 (1960).

The trial court's findings of fact have the same force and dignity as a jury verdict. If supported by some competent evidence, they will not be disturbed on appeal, unless they are so against the overwhelming weight of the evidence as to be clearly and manifestly wrong. *Nelson v. Jordan*, 663 S.W.2d 82, 86 (Tex.App.1983, writ ref'd n.r.e.); *Greater Beauxart Garden Municipal Utility District v. Cormier*, 596 S.W.2d 597, 600 (Tex.Civ.App.1980, no writ); *Skinny's, Inc. v. Hicks Brothers Construction Co.*, 602 S.W.2d 85, 88 (Tex. Civ.App.1980, no writ). A court of appeals may not pass upon the credibility of the witnesses or substitute its findings for those made by the trial judge, nor may it substitute its judgment for that of the trier of fact even though, after reviewing the evidence, it may have reached a different conclusion. *In the Interest of J.J.R.*, 669 S.W.2d 840 (Tex.App.1984, writ dism'd); *Ryan v. Morgan Spear Associates, Inc.*, 546 S.W.2d 678, 685 (Tex.Civ.App.1977, writ ref'd n.r.e.). The trial court is free to evaluate the witnesses and their testimony and to draw all reasonable inferences therefrom, and is not bound to accept the testimony of an interested witness. *R.T. Herrin Petroleum Transport Co. v. Proctor*, 338 S.W.2d 422 (Tex.1960).

We note first that whatever representations Hornsby or his real estate agent may have made later, they could not alter any actual plan which the common owners had established once it had been implemented or impose a plan retroactively. The unchallenged finding was that the scope of the common owners' plan encompassed the lake lots. Parol evidence may be admissible to prove whether a development plan exists and, if so, its terms and scope. It may even be admissible to show that the seller informed the buyer of the declared building plan and promised to include consistent restrictions in all future deeds, as was the case in *Burgess*, 464 S.W.2d 698. But any implied covenants impressed upon the subject property attached when the plan was implemented through sales. Once implemented, proof of any inconsistent representations by only one owner years later in connection with a sale cannot modify any implied easement which had already attached to that land or impose one where none can exist. For that reason, representations made in 1969, for example, could not create a plan retroactive to a time twenty years earlier. While such representations may give rise to some right of action, under the facts shown they could not impress this subdivision with a negative reciprocal easement.

Several witnesses recounted what Hornsby and Grafton represented to them at the time of their purchase, and what they understood, presumed, recollected, or believed based upon those conversations roughly thirty years ago. Hornsby is deceased, so his testimony was unavailable. The McCormicks did not testify. Grafton testified, but was not examined about any representations he made to buyers. He confirmed that he wrote newspaper advertisements in 1955 which described this as a private restricted subdivision, by which he could have meant that it was desirable because of its location, its protected access, and its racial limitations. Five of the ten Evans appellants testified. Only the Arnolds and the Sousareses talked to Hornsby and Grafton before their purchase. Some purchasers never did. Only the Arnolds bought directly from Hornsby as grantor, but his described representations were made two years earlier in a different transaction. Except for one lot owned by the Arnolds, it appears that all other parties hold property whose title can be traced to the McCormicks as original grantors.

The strongest evidence of sales representations came from the Arnolds, who bought one lot in 1955 and one in 1957, and Ted Sousares and Kathryn Sousares, who bought in 1969. Dr. Sousares is no longer an owner, although the land is still owned by his former wife and his children. These

witnesses testified that Hornsby told them that the entire subdivision was restricted to single-family residences, but went on to explain the basis for their understanding from which the court could reasonably draw the conclusions it did. Even though they believed from what they were told that the area was restricted to single-family residences, the express restrictions in their deeds speak only of residential use limited to the construction of one dwelling. Mrs. Arnold conceded that Hornsby never said anything to her about his property or that there was a Block F that was undivided, that she did not understand the term "restricted subdivision" to be tied to the fact that one had to pass through a locked or electric gate in order to enter Beby's No. 1, and that she understood from what she was told that the subdivision already was restricted. Mr. Arnold recalled that Hornsby said this was a restricted subdivision, "everything beyond the gate." Mrs. Sousares believed that Hornsby and McCormick had an agreement in the deed records that already restricted the entire subdivision, although that was not the case, which she admitted was where she got the idea that the subdivision was restricted. Hornsby did not tell her this and she never talked to McCormick. Hornsby never told her that all future conveyances would be restricted, and she never discussed his future intentions with him. Dr. Sousares recalled that Hornsby told them that they could get a copy of the restrictions at the courthouse, (which in fact only could have been a copy of covenants in an individual owner's deed), and that he had the impression that Hornsby would sell the hilltop since he had said that there was room for about nine families on the top. Sousares admitted that he never asked Hornsby whether the hill was restricted, as he was not interested in asking about that land. No one testified that Hornsby ever made promises to them about what he would do with his property, and several witnesses conceded that he never represented that he would restrict any conveyances in the future.

Hornsby's daughter testified that her father intended at all times to keep all his property unrestricted. His law partner confirmed this intent. Both testified that Hornsby told them of his intention to build a restaurant on Block F and keep that parcel unrestricted. He told Kirk that he did not intend to put restrictions on any property he owned.

Charles Marion and his wife owned a place in Beby's No. 1. Hornsby told Marion that the property he owned on the hill and on the lake was unrestricted and he could do anything with it. Mrs. Marion testified that she and other owners in Beby's No. 1 knew that Hornsby's property was not restricted like theirs and that they often teased Hornsby and among themselves about the fact. She understood from what he indicated to her that the lake lots were restricted but not Block F.

■ The Evans appellants further complain that the trial court erred by considering incompetent evidence in concluding that Hornsby's representations excluded Block F. They complain that the court's failure to sustain their objection to an unresponsive answer permitted inference of the fact and constituted reversible error. To the extent that the court affirmatively found that the sales representations excluded Block F, we disagree.

Kirk testified by deposition and was questioned in detail about Hornsby. She was asked about particular transactions, the handling of real estate sales, Hornsby's conferences with purchasers in which she participated, and what she heard him tell prospective buyers. She was asked to relate what Hornsby told her concerning his intent and purpose in creating the subdivision, his plans for his land, and his intent as expressed to her, to build a restaurant on Block F. Kirk told of negotiations with prospective buyers of Block F when he related to them that Block F was unrestricted and could be used for building a restaurant. She already had testified without objection that Hornsby wanted a "convenient subdivision" and that he "envisioned a restaurant at the top of the hill," but that he had died before finding a person "to deal with it on." When asked whether building a restaurant was always

his only intent for the hilltop, she answered:

> Well, you know, he had not yet been made an offer on it, and he made no promise to the people who bought the individual lots that there never would be a restaurant up there. In fact, he was pretty sold on that restaurant, and most people knew about it out there.

Appellants challenge this answer. They do not suggest that the testimony was inadmissible for any other reason. Upon objection, the trial court found that the answer was responsive, and the parties do not claim that he abused his discretion in so ruling. Erroneous admission of evidence seldom will constitute reversible error, unless a substantial right of the party is affected. Tex.R.Civ.Evid.Ann. 103(a) (Supp.1989). It is presumed in a non-jury trial that the trial judge ignores incompetent evidence and bases his decision solely on matters properly before him. *Victory v. State*, 138 Tex. 285, 158 S.W.2d 760 (1942). To obtain a reversal based upon the admission of evidence, the appellant must show that the admission was error and that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Bridges v. City of Richardson*, 163 Tex. 292, 354 S.W.2d 366, 368 (1962); Tex.R. App.P.Ann. 81(b) (Supp.1989). No such showing is made here.

The fact that an answer may not be responsive to the question asked does not mean that the evidence elicited is incompetent, and is not of itself grounds for its exclusion or for a reversal. *Oliver v. Williams*, 381 S.W.2d 703, 709 (Tex.Civ. App.1964, no writ). The parties vigorously litigated what Hornsby told prospective buyers and owners (both before and after their purchases), the assertion that the subdivision was restricted, and Hornsby's actual and apparent intent for the subdivision and especially Block F. Kirk's personal knowledge of these matters was explored at length. Mere unresponsiveness of the answer of a witness, if the testimony is otherwise admissible and relevant, will not ordinarily constitute a basis for reversal.

*Dallas Transit Co. v. Hammer*, 390 S.W.2d 823, 828 (Tex.Civ.App.1965), *rev'd on other grounds*, 400 S.W.2d 885 (Tex. 1966); *see* 1 McCormick & Ray, Texas Law of Evidence Civil and Criminal § 582 (Texas Practice 3d ed. 1980). Appellants have failed to show that the trial court abused its discretion by so ruling or that the complained of answer, even if unresponsive, also was both clearly inadmissible and caused rendition of an improper judgment.

Rena Marion repeatedly testified to her understanding based upon conversations with Hornsby that at least all lakefront lots were restricted. When he advised her that only one residence to a lot was allowed, "he was talking about ... these lots that are subdivided, but not what had been labeled as Block F." Barbara Balgemann testified that Hornsby discussed with her that, although he did not want other buyers to put commercial activity on their property, there was the possibility of his building a hotel or restaurant on the hill. She did not think that he would, because "all those people in there had been advised that it probably would never happen." The trial court could reasonably infer that the purchasers had been advised that such use was possible, though improbable, and that he had made no promises on the matter.

From the evidence, the trial court could reasonably infer that if Hornsby made representations, he made them in accordance with the actual plan of development and with his actual intent, and could decline to find that his apparent intent otherwise was proven by plain and unmistakable evidence. His statements that the area was restricted to single-family residences were correct in that the lake lot conveyances to that time had included a limitation for residential use only. The Holloway lots, of course, have never been so restricted. The term "restricted" subdivision, for example, could include multiple meanings under the evidence, including the fact that it was accessible only by winding rural roads, locked gates, restricted traffic access, and no road extended to Hornsby's lots on the point.

Appellants had the burden to show that the restrictions expressly included in vari-

ous conveyances of property within the subdivision were intended to and did benefit the entire subdivision. The trial court did not find an apparent or actual intent to create such a scheme. The express restrictions support this. All the deeds of the parties now attempting to enforce the covenants state or incorporate the following:

"... these restrictions may be abrogated at any time in whole or in part by the affirmative vote of ¾'s of the then owners of all the lots or blocks shown by the plat of said Beby's Ranch Subdivision No. 1, *voting according to front footage holdings on the 715 foot contour line* ... (emphasis added)."

Since Block F has no lakefront, its owner would have no right to participate in a vote to alter the provisions which restrict it. Texas courts have traditionally attempted to match the burdens of restrictions with their benefits. *Davis*, 620 S.W.2d 561. This in itself constitutes some evidence that Block F received no benefit from the restrictions, and consequently, could not be bound by them. The provision does not reasonably imply that it will be included in future conveyances of Block F. *Curlee*, 244 S.W. 497. We cannot say that the record supports the plain and unmistakable or necessary implication that the Hornsbys and the McCormicks intended the entire subdivision to be similarly restricted. *Saccomanno*, 492 S.W.2d at 713.

Neither can we say that the Evans appellants conclusively established as a matter of law that Block F, the hilltop, was restricted to residential use only, or that Hornsby so represented. We cannot say that the trial court erred by failing to so find or that his findings in this regard were against the great weight and preponderance of the evidence.

The Hornsby devisees and Pollock appeal claiming that, because the proponents failed to prove that Block F was restricted, it was error to render judgment that only part of the common owners' otherwise unrestricted tract was bound. We must agree.

The Evans appellants sought to prove that the land comprising Beby's No. 1 was restricted by implied covenants which arose almost forty years ago when the Hornsbys and the McCormicks implemented their plan for development of this tract. They assert on appeal that any portion the trial court did not declare restricted constituted an immaterial variance. It is true that proof of a general scheme does not require a showing of absolute uniformity in the written deed restrictions of every lot conveyed out of the tract, *Hooper*, 171 S.W. 270, and failure to include uniform restrictions in all conveyances or even omission altogether in one or more deeds will not of itself defeat the plan or the right to maintain it. *Bethea*, 127 S.W.2d at 1031. "It is not essential in the *execution* of the general plan that every lot in the subdivision be impressed with the restriction (emphasis added)." *Painter*, 427 S.W.2d at 135; *see also Green v. Gerner*, 27 S.W.2d 828 (Tex.Civ.App.1930). That is not to say, however, that when the common owners make restricted conveyances out of their original tract in issue, a reciprocal negative easement can be selectively impressed upon only a portion of that which the grantors retain.

An implied reciprocal negative easement does not arise at all unless it originates from a common owner's plan or scheme that encompasses his entire tract and from a benefit accorded all the land he retained when he sold part of his property subject to express restrictions pursuant to that plan. *Saccomanno*, 492 S.W.2d 709; *Hooper*, 171 S.W. 270. This is the underlying justification for imposition of such a remedy. *See Cannon v. Ferguson*, 190 S.W.2d 831, 835 (Tex.Civ.App.1945, no writ). By definition, the rule requires that the restriction is mutual and reciprocal, and restricts the entire tract retained as well as that conveyed.

The cause was tried on the theory that the plan applied to all the land within Beby's No. 1 or not at all. We believe that is what the theory of the rule requires. If the facts found by the trial court are sustained, and we hold that the evidence is sufficient to support them, then the court's legal conclusion must be that the doctrine

does not apply and the judgment must be reversed. As stated in *Cambridge Shores*, 422 S.W.2d at 14, where that court was dealing with facts remarkably similar to this cause:

We think that the evidence so far as appellants are concerned at best raised a fact question as to whether there was a general scheme applying to the whole addition, including Tract A, restricting the use of property. By its judgment the trial court obviously decided the question adversely to appellants.

The equity in this class of action is dependent as much on the existence of the general scheme of development as on the covenant. *Hooper*, 171 S.W. at 272.

The Evans appellants suggest that omission of Block F is an immaterial variance which would not defeat the binding effect on the other tracts. We have examined that argument and are not persuaded. Block F is a tract of over nine acres, is situated in the middle of Beby's No. 1, and adjoins most of the other property in the subdivision. Our holding does not affect existing deed restrictions. We merely recognize that no implied easement was ever impressed upon any remaining subdivision property.

The trial court understandably attempted to use its equity power to reach what it considered a fair result. Under the theory pleaded, however, it could not properly do so. Because a reciprocal negative easement can be imposed only when any general plan or scheme includes the entire tract in issue and attaches to all the property retained by the common owner, if at all, and because the trial court found that the entire subdivision was not intended to be restricted, we necessarily must reverse the trial court judgment and render judgment that the lots and blocks within the subdivision are not subject to the implied restrictive covenants sought to be imposed. The injunction is dissolved.