In re Steven Donald GABEL, Debtor.

**PELICAN HOMESTEAD and Savings Association, Plaintiffs,**

v.

**Charles N. WOOTEN, Trustee, Defendant.**

**Bankruptcy No. 484–00884–LO. Adv. No. 485–0015.**

United States Bankruptcy Court, W.D. Louisiana.

Oct. 8, 1985.

William C. Sandoz, Opelousas, La., for debtor.

Wm. E. Wright, David P. Banowetz, Jr., New Orleans, La., for plaintiffs.

Keith Rodriguez, Lafayette, La., for defendant.

James E. Mouton, Lafayette, La., for Comeaux, et ux.

Calvin T. Guidry, Lafayette, La., for Guaranty Bk. & Tr. Co.

## FINDINGS AND CONCLUSIONS

RODNEY BERNARD, Jr., Bankruptcy Judge.

This action arises out of a motion to annul and set aside sale of property filed by Pelican Homestead and Savings Association (Pelican) on December 3, 1984. By an order of court dated January 7, 1985 the motion was converted to an adversary proceeding. Trial on the merits was held on June 7, 1985, at which time the matter was taken under advisement; the following represent the findings and conclusions of this court:

### Facts

On August 22, 1983, Steven Donald Gabal and Cheryl Marie Fontenot Gabal executed a promissory note in favor of Louisiana First Mortgage Company in the amount of $132,000.00. This note was secured by a mortgage on a certain piece of immovable property located at 103 Glynnwood Drive, Lafayette, Louisiana (the Glynnwood property), which is the main focus of the present controversy. Well prior to the filing of bankruptcy, Louisiana First Mortgage made a valid assignment of the note and mortgage to Pelican Homestead, the present plaintiff.

The confusion began when on August 29, 1984 Mr. Gabal filed his voluntary petition under Chapter 7. As the caption of the case still to this day indicates, the debtors name was incorrectly spelled Gabel rather than Gabal. Nevertheless, the case went forward in the name of Steven Donald Gabel and Charles N. Wooten was appointed trustee.

According to the record of the clerk of court, (misspelling aside), on September 7, 1984 a notice of the filing and of the first meeting of creditors was sent out to all creditors and interested parties whose names appeared on the official mailing matrix submitted by the debtor. Included in

the mailing matrix list was the name and address of the plaintiff, Pelican. An employee of Pelican acknowledged at trial that Pelican's name and address as listed were correct, yet Pelican claims never to have received the clerk's notice. In a like manner, Pelican also claims that it did not receive a later notice, this one sent by the trustee announcing his intention to sell the subject property. The record discloses, and the trustee testified, that his office sent a notice of intent to all creditors and interested parties by mail on October 12, 1984. As might be expected, the trustee's notice, like the clerk's previous notice, continued the mispelling of the debtor's name. The trustee testified that in mailing out the notice he also utilized the "mailing matrix" list which as previously stated, correctly listed Pelican's name and address. The trustee also testified that his normal practice, when a notice is returned by the post office as being undeliverable, is to place it into an envelope which is kept with the file. In this case no notice sent to Pelican was ever returned. Additionally, the court notes that in spite of the mispelling of the debtor's name the notice does contain a complete description of the Glynwood property and even gives the correct municipal address. It is hard for this court to imagine that a sophisticated creditor such as Pelican given this information and given the very close similarity of the names, (i.e. Steven Donald Gabel (cf. Steven Donald Gabal), would not have recognized this as the property upon which it held a mortgage, mispelling or no. At any rate, as stated, Pelican claims that it did not receive the notice, so that the query just posed is for the moment, I suppose, mooted.

Pelican, in support of its claim that no notice was received, offered the testimony of two of its employees, both of whom described the normal routing and internal procedure employed by Pelican with respect to such "bankruptcy notices". The gist of this testimony is that had such a notice been received Pelican would have in turn opened up a special file. Accordingly, based on the absence of such a special file here, the indication is that no notice was ever received. Neither of these witnesses could, however, testify from anything approaching an independent recollection that they themselves, much less Pelican, never received a notice.

In addition to his formal notice, the trustee also had an ad placed in the Lafayette "Daily Advertiser" which ran on November 11, 1984, just prior to the sale. Apparently by this time the trustee had discovered the error regarding the debtor's name as the ad correctly has it spelled "Gabal". Although it is true that it was Pelican's Metairie office which handled the mortgage on the subject property, nevertheless as a Pelican employee testified, Pelican has and had at that time an office in Lafayette. Unfortunately, this too was apparently not enough to capture Pelican's attention.

By and by, no objection having been filed as the result of the notice of intent, the trustee proceeded to sell the property at public auction as scheduled on November 13, 1984. Now, with the advantage of hindsight, it is perhaps not surprising that Pelican did not appear at the sale. The court however, wondered why the trustee's curiosity had not been aroused when he did not hear from Pelican prior to the sale, given the nature and size of its claim. When questioned by the court at hearing, the attorney for the trustee responded that he did not find this strange and that it is quite common not to hear from the secured creditors until they show up the day of the sale. Indeed, he pointed out, regarding the instant sale two other creditors, Guaranty Bank and American Bank, who held similar secured claims on another piece of property being sold according to the same notice, also made no attempt to contact him before the day of the sale.

There were approximately fifteen people at the sale and about four or five of these people participated in the active bidding. An attempt by the auctioneer to start the bidding at $70,000.00 was not successful and he was forced to continually lower his invitations finally to $15,000.00 before he received the first affirmative response. Bidding in earnest then began at that fig-

ure and eventually reached a high of $65,-000.00, at which point only two bidders were left competing. Finally the property was "knocked down" to the highest bidder, Conrad Comeaux, for a total bid of $69,-000.00. Subsequently, on November 14, 1984 Mr. Comeaux tendered to the trustee his bid price of $69,000.00 in the form of certified funds. The trustee then, on November 19, 1984, presented the court with a motion and order to ratify the sale and cancel the liens, which the court approved and signed that same day. With the order in hand, the trustee promptly delivered a bill of sale to the Comeaux's. Following the trustee's suggestion, the Comeaux's then had the sale recorded in the conveyance records in Lafayette and had the recorder cancel the outstanding liens of record on the strength of the order.

The whole process appeared to be complete and beyond reproach until on December 3, 1984, some thirteen days after the signing of the order of ratification, Pelican filed its present motion to annul and set aside the sale. Ironically had the order of November 19 been properly entered and noticed, Pelican would probably find itself out of court, the applicable appeal delays having run. Instead, as the official docket entry card maintained by the clerk reveals, no official notation indicating a notice of entry by the clerk was ever made, (at least not until February 13, 1985 as a direct result of the present controversy). In a previous motion for summary judgment filed by the trustee, I found on the facts just stated that the delays for appeal had not begun to run as to the order of November 19, 1984 and the matter has been allowed to proceed to the merits as a grant of new trial on the basis of Pelican's claims of defective notice and lack of adequate price. This then brings us up to the present point.

Regarding the merits of the claims and defenses thereto, as this court sees them the primary issues to be addressed here are as follows:

*Issues*

1. Was Pelican properly noticed of the trustee's intent to sell the Glynwood property at public auction, free and clear of liens?

2. Did Pelican's failure to object to the sale as directed by the notice constitute the consent to the sale within the meaning of 11 U.S.C. 363(f)(2)?

3. Was the price paid at the sale a "fair equivalent value" for the property?

## I. *Notice:*

As was stated, Pelican claims that it never received the trustee's notice of intent nor did it receive the clerk's combined notice of filing and scheduling of the first meeting of creditors. The evidence before me clearly indicates that both the clerk and the trustee mailed their respective notices to everyone listed on the mailing matrix. The evidence and testimony additionally show that Pelican's name and address is properly listed on that matrix. On such fact two extremely important, widely recognized presumptions immediately come to bear: (1) that a piece of mail properly addressed and sent through the U.S. Postal system is presumed to have been received by the addressee. "Russell on Evidence" *Norton Bankruptcy Law Adviser* (May 1985—No. 5) (Citing:) *Hagner v. U.S.*, 285 U.S. 427, 430, 52 S.Ct. 417, 419, 76 L.Ed. 861, 864 (1932). (2) The regularity of official acts is presumed. *Norton* id., (citing:) *In re Farris* 43 B.R. 726 (BC N.D.Ill.1984); *In re Markey* 33 B.R. 332 (BC N.D. Ohio 1983). As Judge Russell's article explains although these presumptions are recognized in many, if not all other areas of the law, they are particularly important in the bankruptcy setting where so much is dependent upon the special concept of "notice and opportunity for hearing". This concept is found throughout the Code and the Rules and has developed into perhaps the single most useful procedural device to insure the smooth functioning of the Bankruptcy Court. See e.g. 11 U.S.C. § 102(1); Rules 2002, 6004. In practice it contemplates that the trustee will be allowed to

take many actions by simply giving the proper notice to the parties in interest. If proper notice has been given the court will be required to intercede only when a party makes an expressed objection or request for a hearing. This allows the court to be available to hear those matters in which an actual controversy exists and frees it from the day-to-day supervision of the estate that so plagued practice under the former Act. For the procedure to work, however, creditors must be alert to protect their own interest as their failure to react will often result in things being done which would be entitled to the same respect as a thing adjudged. It also places a high premium on the validity and effect of the two presumptions regarding the mailing of notices just discussed. To explain, if the desired finality of acts done pursuant to the "notice and opportunity for hearing" concept is to be achieved, the presumptions regarding mailing become an almost indispensable ingredient of that concept. It is simply far too easy and tempting to avoid the sometime unpleasant consequences of a neglectful failure to object by merely claiming that no notice was received.

As to the presumptions themselves, though it is true that both are said to be rebutable, this court is of the view that such should require a very strong showing. Both presumptions are based upon not only the strong judicial policy needs just touched upon, but are also premised upon what, in the absence of the presumption, would be a very normal logical inference from the circumstantial facts typically inherent in such situations. The plain fact of the matter is that in the absence of unusual circumstances, properly addressed mail normally is received. Both logic and policy need then dictate that a heavy burden be placed on the party claiming not to have received a properly mailed notice. To be more precise, if the system is not to be engulfed in needless confusion and paralytic over-precaution it must be free to rely on certain axiomatic assumptions such as the regularity of the mails. For the rare exception, the safety value of "rebuttal" is there and always available to keep concept

tied to fact. It is submitted that, given the importance and utility of the concept, "rebuttal" requires something more than a bare bones denial.

In a case addressing a very similar claim of non-receipt another bankruptcy court has commented as follows:

 The applicant says neither the employees in charge of the account nor the central filing office received the notice, but the records of the Bankruptcy Court show it was properly mailed and the creditor admits that its address was properly set forth in the debtors' schedules. The presumption that the addressee of properly addressed mail received the same in due course is virtually irrebutable, and we think banks and other organizations and associations must follow procedures which will insure a proper processing of these notices when they are received.

The *Tassone* case and the instant proceeding comprise the only situations involving alleged non-receipt of duly mailed notices to come before the Court in which the undersigned has presided for 22½ years and we think that if the recipients of such notices of which many thousands are sent each year are permitted to contradict the official records of its competent clerks, the flood gates would be opened like a Pandora's box to a myriad of belated applications based on similar allegations and that the procedures and rules of Court designed for the protection of both the bankrupt and its creditors, as stated by the District Court for the Eastern District of Virginia in *In re Capshaw*, [423 F.Supp. 1388 (E.D.Va. 1977)] supra, would become meaningless; that such situations would not arise if the organizations' clerks who have been found to have been grossly negligent in referring matters to counsel and taking required steps in matters involving filings to perfect secured transactions under the Uniform Commercial Code and other complications were properly trained and supervised. The notice of the final date for filing dischargeabili-

ty petitions is at the bottom of the notice of the first meeting of creditors and it would be very easy for a careless or untutored employee to overlook it and the precedent of permitting the official dockets and records of the Court to be contradicted and opened up on the strength of general allegations negating receipt of documents subject to processing by numbers of employees would be dangerous if made: we decline to grant the prayer of the application that we effect such result and hereby refuse and deny such prayer. Matter of *John J. Cleary and Elaine H. Cleary*, 18 B.R. 114 (B.C.W.D.Penn. 1982).

■ Although this court cannot perhaps claim the same long spotless record regarding the absence of such claims as does the Pennsylvania court they are nevertheless still by far the rare exception rather than the rule. Simply stated, the system of notice by mail just plain works and these presumptions which rest upon the dependability of that system are re-validated daily by the experience of this and of every other court in the Federal Judicial System. The routine or internal system for handling such notices described by Pelican sounds all too similar to the description given in the *Cleary* case and my fears are likewise the same. No doubt the problem here was exacerbated by the mispelling of the debtor's name, however, as I have previously pointed out, this is simply too thin a veil to shield one placed in Pelican's position. Accordingly, I find that the presumption has not been rebutted and Pelican is therefore presumed to have received the Trustee's notice, with all of the consequences attendant thereto.

Even if I did not find in favor of the presumption, I would still find that the remaining logical inference coupled with the evidence and testimony of record all weigh in favor of the conclusion that Pelican did in fact receive the notice. First, there is Pelican's claim that it did not receive, not one but two, separate notices, both properly addressed to it, sent by two different people, at two widely separate times. The sheer statistical improbability of this happening to the same creditor in the same case would appear to this court to be astronomical. No explanation is offered as to how this could have occurred, no hole in the network has been pointed out. The only thing offered is again an unsupported denial by Pelican. Added to this is a good deal of credible testimony that Pelican had actual knowledge of the impending sale and yet for some inexplicable reason, failed to act to protect its interest. The court was particularly impressed by the testimony of Karen Anderson, a witness called by the trustee. Ms. Anderson stated that she was interested in purchasing the property herself and in an effort to obtain information regarding the existing mortgage she contacted Pelican's office several times prior to the sale. During the course of her conversation with various Pelican employees she, on numerous occasions, told them that she had been informed that the property was involved in a bankruptcy proceeding and that the trustee was planning to sell it at public auction. She also testified that because the people at Pelican were having difficulty locating the file she actually spelled (i.e. correctly spelled) the debtor's name for them, gave them the date and time of the scheduled sale and gave them the address of the property. As the old saying has it—"one can lead a horse to water, but one cannot make it drink." Certainly, secured creditors are be expected to be more vigilant in the protection of their own interests, than this. Accordingly, I find as a matter of fact that: (1) Pelican received the formal notice it was entitled to as a matter of law, (2) Pelican had actual notice by virtue of the information supplied to it by Ms. Anderson, and (3) Pelican has constructive notice by virtue of the ad that appeared in the Lafayette "Daily Advertiser", previously discussed.

## II. *Sec. 363 Requirements:*

Section 363 of the Code governs the "use, sale or lease" of property of the estate. Under sub-section (b) the trustee is empowered "after notice and a hearing" to

sell property of the estate for purposes other than in the ordinary course of the debtor's business. Further, according to Section 363(f) he may sell such property free and clear of all existing liens and encumbrances provided any one of the following conditions are met:

(1.) Applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2.) *such entity consents;*

(3.) *such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;*

(4.) such interest is in bona fide dispute; or

(5.) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. Id. (emphasis added)

All have here agreed that numbers (1), (4) and (5) are inapplicable. Pelican, however, maintains that it did not give its consent and that the price obtained was less than the scheduled value of its lien. (i.e. negating the only other two alternatives). Accordingly, Pelican argues that, the trustee having failed to satisfy any of the 365(f) alternative provisions, the sale was improper and should be set aside.

Consent is normally either expressed or implied. I have already discussed at some length the concept of "notice and opportunity for hearing" and the normal mechanics of its operation. It is sufficient here for a brief observation concerning the application of that concept via *Rule 6004*, which governs "sales outside of the normal course". According to *Rule 6004*, notice of such sales is to be given pursuant to the special provisions found in *Rule 2002*. The combined import of the *Rule 6004* and *2002* provisions is that the notice is to state a time for the filing of objections. A hearing is thereafter conducted only in the event of a timely filed written objection. *Rules 6004(d), 2002(c).* Where no objection is filed, however, the sale is confirmed and the necessary conveyance is accomplished in keeping with the provisions of *Rule*

*6004(e)*. I find that the trustee's notice has exactingly complied with these provisions.

■ Having previously determined that Pelican was properly noticed, I need now only decide if this failure to object, according to the clear terms of the notice, should be viewed as "consent" within the meaning of Section 365(f)(2). My own reading of the law and the jurisprudence in this area leaves me with the firm belief that this is exactly the legal effect that must be given to such a failure to object. Indeed I find the case law to be replete with examples of courts finding consent based upon such facts; to cite but a few: In re *Torchia*, 188 F. 207; In re *Tel-Tone Radio Corporation, etc.*, 133 F.Supp. 739; In re *Pioneer Sample Book Company*, 374 F.2d 953; In re *Hotel Associates, Inc.* 6 B.R. 108. Some courts have recently pointed out that under the new rules where there is a failure to object, no further court blessing of the sale is required as the trustee is empowered, by that fact alone, to act. In re *Hanline* 8 B.R. 449 (B.C.N.D.Ohio 1981); In re *Frank Meador Brick, Inc.* 8 B.R. 450 (B.C.W.D. Va.1981). Reitterating, I find that Pelican is estopped to deny its implied consent at this late stage. Accordingly, I find that the trustee's sale has complied with the provisions of Section 363(f).

### III. *Fair equivalent value:*

■ Having concluded that the sale meets the requirements of Section 363(f), the only possible remaining basis for attack is that the price obtained via the sale was all out of proportion or not the "fair equivalent value" for the property. The leading case on this point, in this circuit, is *Durrett v. Washington National Insurance Company* 621 F.2d 201 (CA5 1980). Here the Fifth Circuit reversed a lower court decision by holding that a foreclosure sale for less than seventy (70%) percent of the fair value of the property would not be equivalent value and thus was not fair consideration. Although the case deals with an attack on a pre-petition sale as a fraudulent transfer and is therefore distinguishable, this court finds that the reasons supporting

the 70% rule are equally applicable to public sales conducted by the trustee. To use this gauge, however, one must first determine the proper value to be assigned to the property at the time of the sale. In this regard the court heard the testimony of two expert real estate appraisers, Preston Babineaux who testified for the Comeauxs and Jeff Gossen who was called by Pelican. Mr. Babineaux stated that his original appraisal done at the time of the purchase assigned a value of $160,000.00 to the property but was contingent upon ten (10) separate improvements being made. In an "as is" condition Mr. Babineaux estimated the value to be between $105,000.00 and $110,000.00. Mr. Gossen's original appraisal was done in June of 1983 at which time he assigned a value of $148,500.00. Noting a general turn down in the market since that time Mr. Gossen stated that the property now, and at the time of the sale, would be worth 15% to 20% less, or by the most conservative of these $118,800.00. The court, however, heard much testimony regarding hidden defects in the property which were later discovered and which by the admission of both experts were not accounted for in their respective appraisals. Further, although neither could state with any measure of assurance how much the defects would have lowered the value, both did agree that had they been considered their appraisals would have certainly been lowered. Taking all of this into consideration, I find that a reasonable value, accounting for the defects is the lowest appraisal figure, $105,000.00. Applying the 70% rule of *Durrett* then yeilds a total figure of $73,500.00 which should have been obtained as a minimum at the sale. The Comeauxs paid only $69,000.00 for the property at the sale. Accordingly, I find that the Comeauxs were unjustly enriched to the detriment of the secured creditor, Pelican, to the tune of $4,500.00, the increased price Pelican would have been logically expected to bid at the sale. Additionally, had Pelican purchased the property at the sale it no doubt would have been charged with the administrative cost on its bid, calculated at 3.5% of the total sale price. Accordingly, I find that the Comeaux's were additionally unjustly enriched at the expense of the estate in the amount of $2,572.50. The Comeauxs are therefore to reimburse these parties for the amounts stated. In all other respects the claims of Pelican and all other various crossclaims and counterclaims etc. growing out of the controversy shall be denied.

A separate judgment in accordance with the foregoing shall be duly signed and entered upon submission by the trustee.