483 S.E.2d 757

MARATHON FINANCE COMPANY, a Delaware corporation, Respondent,

v.

HHC LIQUIDATION CORP., a Delaware corporation (f/k/a The Hilton Head Company, Inc.), Westin Hilton Head Limited Partnership, a Delaware limited partnership, Property Research Holdings, Inc., a South Carolina corporation, and Town of Hilton Head Island, a South Carolina municipality and body politic, Defendants, of whom Westin Hilton Head Limited Partnership is Appellant.

No. 2625.

Court of Appeals of South Carolina.

Heard Dec. 3, 1996.
Decided Jan. 27, 1997.
Rehearing Denied April 24, 1997.

John C. Bruton, Jr., Benton D. Williamson, and Deborah P. Morgan, all of Sinkler & Boyd, Columbia, for appellant.

G. Richardson Wieters, of Hilton Head Island; and Stephen A. Spitz, Columbia, for respondent.

GOOLSBY, Judge:

This is an appeal from an action by Marathon Finance Corporation seeking a declaration that certain restrictive covenants and deed restrictions no longer encumbered a tract of its land on Hilton Head Island known as the Barony Tract. The trial court declared the covenants and deed restrictions to be extinguished, null, void, and of no force or effect whatsoever and further ordered the Register for Mesne Conveyances of Beaufort County to note their extinguishment and cancellation on the pertinent documents. The trial court further held that, with the exception of certain specifically enumerated easements, Westin Resort Hilton Head Limited Partnership (Westin), an adjoining landowner and one of the defendants in the lawsuit, had no rights in or to or concerning Marathon Finance's property. Westin appeals. We affirm.

## FACTS

In 1983, the Hilton Head Company owned three adjacent tracts of land: the Barony Tract, the Hotel Tract, and the Mid-Rise Tract. That same year, the Hilton Head Hotel Company (Hotel Company), an affiliate of the Hilton Head Company, together with Aries Property Holdings and R.H./ A.E. Hotel Company, formed a general partnership known as The Barony Company. In a joint venture agreement dated November 5, 1983, these three entities proposed to develop the three tracts.

On November 5, 1983, pursuant to the joint venture agreement, the Hilton Head Company, conveyed by separate instruments each of the three tracts to The Barony Company. Covenants executed the same day restricted the Barony Tract to residential, short-term rental, and limited commercial uses. In February, 1984, these covenants restricting the use of the Barony Tract were recorded with the deed conveying the tract. A number of these covenants were identical to restrictions placed on the Hotel Tract and the Mid-Rise Tract.

On September 4, 1985, as hotel construction on the Hotel Tract neared completion, The Barony Company redeemed all

partnership interests held by the Hotel Company in The Barony Company. The joint venturers ratified the purposes of the joint venture and agreed to continue to cooperate in the development of all three tracts. As consideration for the redemption, however, The Barony Company conveyed the Barony Tract to the Hotel Company. On September 23, 1985, the Hotel Company, in turn, executed a mortgage on the Barony Tract to Marathon Finance.[1] The mortgage secured a note in the original principal amount of $8,500,000.00.

The deed conveying the Barony Tract from The Barony Company to the Hotel Company contained restrictions limiting the number of dwelling units per acre on the tract, the type of structures to be placed on the tract, and the height of the buildings and structures to be built on the tract. The deed was recorded before Marathon Finance recorded its mortgage from the Hotel Company and further provided that these restrictions were to run with the land.

On December 30, 1985, The Barony Company conveyed the improvements on the Hotel Tract to R–H Hilton Head, Inc. These improvements constituted the present Westin Resort.

Subsequently, on November 24, 1986, the Hotel Company went into bankruptcy. Several months later, on July 27, 1987, the trustee in bankruptcy filed a Motion for Approval of Compromise requesting approval of a settlement agreement between the trustee and Marathon Oil Company, a company related to Marathon Finance. The agreement, which was dated June 24, 1987, provided for the transfers to "a Marathon entity or entities" of certain properties, including the Barony Tract. The transfers were to be "free and clear of all liens, charges and encumbrances whatsoever," and subject only to certain secured real property interests. The settlement was later clarified by the trustee on August 29, 1987, in a report in which the trustee specifically stated that "covenants ... [and] restrictions ... shall be treated as provided for under South Carolina law."

---

1. The names "Marathon Finance Company" and "Marathon Finance Corporation" appear to have been used interchangeably. We assume both names refer to the same entity, which we refer to as "Marathon Finance."

On July 30, 1987, the trustee filed a Notice of Sale of Assets that advised of the proposed sale of the Barony Tract and other properties. The notice stated the sale would be "free and clear of all pledges, security interests, liens, charges, other encumbrances, claims, options and interests" except for certain specifically enumerated mortgage liens. The Barony Company, however, on August 17, 1987, filed an objection to the notice, asserting its right to protection of ten interests. These interests consisted of recorded easements and access and use agreements and did not include any of the covenants and restrictions at issue in this appeal.

On September 10, 1987, Marathon Oil Company and The Barony Company entered into a settlement agreement that provided for the protection of the ten interests asserted by The Barony Company. The bankruptcy court approved the settlement agreement, filing its order on September 24, 1987.

On September 30, 1987, the trustee recorded a document entitled "Release and Cancellation of Restrictions, Covenants & Encumbrances." This document referenced the Barony Tract and an adjoining tract now owned by the Town of Hilton Head Island. It expressly waived, relinquished, released, cancelled and forever discharged all covenants, restrictions, and deed restrictions.

After approval by the bankruptcy court of the settlement agreement, the trustee filed a complaint to sell the properties listed in the June 24, 1987 agreement free and clear "of all liens, encumbrances and other interests" except those otherwise defined.

The Barony Company responded by filing an answer on October 5, 1987, in which it requested protection of the same ten recorded easements and access and use agreements listed in its prior objection to the Notice of Sale of Assets. Later, however, The Barony Company withdrew its answer and entered into a second stipulation. The second stipulation provided for the superior status of only the ten recorded easements and access and use agreements.

On October 31, 1987, the trustee conveyed the Barony Tract to Marathon Properties, Inc. The deed referenced the prior proceedings in the bankruptcy court and conveyed the proper-

ty free and clear of all liens and encumbrances except as specifically defined in the June 24, 1987 settlement agreement.

On November 4, 1987, the bankruptcy court issued an order stating, among other things, "[t]hat all persons or entities who have failed to assert any lien, encumbrance, or other interest in [the Barony Tract and other properties], other than Permitted Exceptions, are forever barred from doing so."

After the trustee conveyed the Barony Tract to Marathon Properties, a dispute arose between Marathon Properties and The Barony Company concerning the enforceability of one of the restrictions. Marathon Properties commenced an adversary proceeding in the bankruptcy court on May 11, 1988, in which it requested "a declaration of [its] rights with respect to the [effect of the] transfer of [t]he Barony Tract free and clear of the restrictive covenants found in the former deed between The Barony Company and [the Hotel Company]."

On January 4, 1990, the bankruptcy court determined Marathon Properties held title to the Barony Tract unencumbered by the restriction at issue, holding the prior proceeding had extinguished that restriction.

Marathon Properties subsequently conveyed the Barony Tract to Marathon Finance, its affiliate.

AOKI Carolina Hotel Company acquired the Hotel Tract and its improvements from The Barony Company and R–H Hilton Head Company in October, 1988. The contract documents disclosed to AOKI the pendency of the declaratory judgment action in the bankruptcy court concerning a restrictive covenant on the Barony Tract. Westin Hotel Company, an AOKI affiliate, assisted in the acquisition of the property and continued to manage it after the conveyance. On June 27, 1989, AOKI deeded the Hotel Tract to the Westin Hilton Head Limited Partnership.

## I.

Westin first argues the designation of the sale of the Barony Tract as "free and clear" of "encumbrances" did not by its terms eliminate the covenants and restrictions in question. Westin maintains (1) the covenants and restrictions were not "encumbrances"; (2) the covenants and restrictions were not

"interests" that could be extinguished in a bankruptcy sale; and (3) even if the covenants and restrictions were "interests" in property, the statutory requirements for their extinguishment were not met. We reject all three arguments.

### A.

The trial court correctly concluded as a matter of law the term "encumbrance," as used in the context of this litigation, included covenants and restrictions. *See Morris v. Lain,* 176 S.C. 310, 313, 180 S.E. 206, 208 (1935) ("An incumbrance is a burden upon land depreciative of its value, such as a lien, easement, or servitude, which, though adverse to the interest of the landowner, does not conflict with his conveyance of the land in fee."); *Grice v. Scarborough,* 29 S.C.L. (2 Speers) 649, 652 (1844) ("[A] right to an easement of any kind is an incumbrance...."); 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 74, at 518 (1995) ("An encumbrance may be defined ... as any right to or interest in the land which may subsist in a third party, to the diminution of the value of the land, but at the same time consistent with the passage of the fee thereto.").

### B.

Westin also argues that the covenants and restrictions at issue were not "interests" in property that could be extinguished in a bankruptcy sale, and even if they were, none of the conditions of 11 U.S.C. § 363(f), the statute authorizing such a sale, had been met. These arguments, however, were neither presented to nor ruled upon by the trial court; therefore, they are not preserved for appellate review. *See Noisette v. Ismail,* 304 S.C. 56, 403 S.E.2d 122 (1991) (where the trial court does not explicitly rule on a question and the appellant fails to make a Rule 59(e), SCRCP motion to amend or alter the judgment on that ground, the issue is not properly before the court of appeals and should not be addressed); *Hubbard v. Rowe,* 192 S.C. 12, 5 S.E.2d 187 (1939) (an issue on appeal must first have been fairly and properly raised to and passed on by the lower court).

## II.

### A.

■ We do not agree with Westin's argument that because The Barony Company, as owner of the Hotel Tract, did not execute the "Release and Cancellation of Restrictions, Covenants & Encumbrances" dated September 30, 1987, that document failed to terminate the covenants and restrictions in question.

What Westin overlooks is that, as we noted above, before the trustee executed the release and cancellation, The Barony Company had agreed to—and the bankruptcy court had approved—the trustee's conveyance of the Barony Tract free and clear of any express or implied covenants except the ten interests for which The Barony Company had specifically requested protection as part of an overall settlement.

■ Moreover, after the trustee filed a complaint to sell the Barony Tract, among other properties, free and clear "of all liens, encumbrances and other interests" except as otherwise defined, The Barony Company withdrew the answer it had filed to the trustee's complaint and then entered into a stipulation in which it sought to protect only ten enumerated interests that did not include the covenants and restrictions at issue. The bankruptcy court, as we mentioned, thereafter issued an order barring "all persons or entities" from asserting any lien, encumbrance, or other interests in the Barony Tract, other than the ten interests The Barony Company endeavored to protect. These "persons or entities" included The Barony Company, a party over which the bankruptcy court then had jurisdiction and a party with which Westin is in privity. There being no appeal from the bankruptcy court's order by The Barony Company, its right or the right of any of The Barony Company's successors-in-interest to challenge any of the order's provisions no longer exists. *See In re Met–L–Wood*, 861 F.2d 1012 (7th Cir.1988) (after the time for an appeal lapses, the doctrine of *res judicata* bars a new suit attacking an order confirming a judicial sale by a party to a sale proceeding, a successor to the party, or anyone in privity with the party).

### B.

We likewise find no merit to Westin's contention that the trustee did not record the release and cancellation in such a manner that the document would have been discovered by an examination of the Hotel Tract's chain of title. Even if this were the case, contract documents disclosed to AOKI, Westin's predecessor-in-interest, the then pending litigation and its potential impact on the use of the Barony Tract. Certainly, then, irrespective of record notice, Westin's predecessor-in-interest had actual notice of what was taking place. *See First Presbyterian Church of York v. York Depository,* 203 S.C. 410, 27 S.E.2d 573 (1943) (one having actual notice of an instrument that affects title to property is bound by such notice regardless of whether the instrument is recorded); 66 C.J.S. *Notice* § 14, at 653 (1950) ("Actual notice may dispense with required constructive notice."). Notice to AOKI was notice to Westin.

### III.

Westin next asserts The Barony Company, as owner of the Mid–Rise Tract, assigned to Marathon Properties in 1989 certain easements, licenses, and agreements benefitting the Mid–Rise Tract, including the covenants and restrictions in question and thus, if it had enforcement rights that could be assigned to Marathon Properties, then The Barony Company, as owner of the Hotel Tract, had equivalent rights that it could assign to AOKI, a subsequent owner of the Hotel Tract. This argument was neither raised to nor ruled upon by the trial court; therefore, we cannot review it on appeal. *Hendrix v. Eastern Distribution, Inc.,* 320 S.C. 218, 464 S.E.2d 112 (1995); *Hubbard* at 19, 5 S.E.2d at 189.

### IV.

Westin argues that, as a successor-in-title to The Barony Company, it has the right to enforce the covenants and deed restrictions as negative reciprocal easements. The problem with this argument is that, as we indicated above, these covenants and restrictions no longer exist.

■ Moreover, and as the trial court found, neither they nor the deed to the Barony Tract referenced any general plan or scheme, one of the elements required to establish a negative reciprocal easement. *Bomar v. Echols,* 270 S.C. 676, 244 S.E.2d 308 (1978).

### V.

Westin next argues the bankruptcy court's order of January 4, 1990, was not binding on AOKI, its immediate predecessor-in-interest, because AOKI was an indispensable party to the litigation insofar as a contract had been executed for its purchase of the Hotel Tract. Because the trial court did not address this argument, we have no authority to decide it on appeal. *Hendrix* at 218–19, 464 S.E.2d at 113; *Hubbard* at 19, 5 S.E.2d at 189.

### VI.

■ Finally, Westin argues the trial court exceeded its authority in holding Westin had "no rights in or to or concerning" the Barony Tract except for the matters set forth in Exhibit A of its order. In support of this argument, Westin notes many of the matters set forth in Exhibit A dealt with properties other than the Barony Tract. Insofar as the trial court confined its holding to Westin's rights in the Barony Tract, we fail to see how the ruling affected matters not before the trial court.

**AFFIRMED.**

ANDERSON, J., concurs.

CURETON, J., concurs and dissents in a separate opinion.

CURETON, Judge: (Concurring in part and dissenting in part):

I concur with much of the majority opinion, but I respectfully disagree that all of the 1985 deed restrictions have been extinguished. I write separately as most of my reasoning and analysis is different from the majority.

## I. 1983 RESTRICTIONS AND IMPLIED RECIPROCAL NEGATIVE EASEMENTS

Westin argues that it is entitled to enforce the "1983 Restrictions," which were expressly placed on the Barony Tract in a document entitled "Declarations, Conditions, and Restrictions." This document was executed by the Hilton Head Company (HHC), and recorded contemporaneously with the deed transferring the Barony Tract to the Barony Company (Barony). These restrictions, by the terms of the document, run with the land and are "binding on all parties having any right, title, or interest in the [Barony Tract] or any part thereof, their heirs, successors, and assigns." The document further states that the restrictions are entitled to be enforced by HHC (the grantor of the contemporaneous deed), Barony (the grantee of the contemporaneous deed), a property owners' association (which was to be formed), or "any owner of any portion of the [Barony Tract]." The document states that the restrictions "shall inure to the benefit of each owner [of the Barony Tract]." The restrictions do not reference any other tract or state that any grantees of HHC in another tract are entitled to enforce the restrictions. Since the 1983 restrictions are outside of Westin's chain of title to the Hotel Tract, Westin only attempts to enforce these restrictions against Marathon as to the Barony Tract by use of the theory of implied reciprocal negative easements (IRNE). *See, e.g., Bomar v. Echols*, 270 S.C. 676, 244 S.E.2d 308 (1978) (stating that, pursuant to the IRNE doctrine, any subsequent grantee may enforce restrictions against any other grantee if the owner of a tract of land subdivides it and imposes restrictions on its use pursuant to a general plan of development). However, I agree with the majority that Westin cannot enforce the 1983 restrictions with this theory, irrespective of the effect of the bankruptcy proceedings.

The real difficulty with this issue is that Westin attempts to impermissibly expand the IRNE doctrine because it is not a party entitled to enforce the 1983 covenants by the document's terms. Although Barony is listed as a party entitled to enforce the restrictions, that is solely because it was the grantee of the Barony Tract in the contemporaneously executed 1983 deed, which, as part of the 1983 joint venture agreement, contemplated Barony subsequently selling interests in

the Barony Tract to homeowners. Barony, as a grantor in the contemplated sales as well as the company developing the property, would have been a logical party entitled to enforce restrictions on the Barony Tract. Admittedly, Westin is a successor of Barony, but only through the Hotel Tract, not the Barony Tract. Thus, Westin is not a successor-in-interest of Barony in the Barony Tract, and Westin cannot enforce the 1983 restrictions by reference to the enforcement provisions. *Cf.* 5 R. Powell & P. Rohan, *Powell on Real Property* ¶ 673[3], at 60–85 (rev. ed. 1996) (noting that "when only a portion of the burdened or benefitted parcel of land has been acquired, the general rule is that the transferee succeeds to that part of the burden or benefit, as the case may be, which pertains to the part of the land acquired."). The difficulty is that HHC did not link enforcement of the covenants and restrictions among the three tracts during the 1983 transactions, so that, for example, a residential owner on the Barony Tract could ensure that the restrictions on the Hotel Tract were enforced, and vice versa. *Cf. Circle Square Co. v. Atlantis Dev. Co.*, 267 S.C. 618, 230 S.E.2d 704 (1976) (where the various and different types of restrictions placed on properties within a mixed-use subdivision were "specifically declared" to be enforceable by any owner of any type of property within the entire subdivision). Indeed, the document states only that the benefit of the restrictions extends to owners of the Barony Tract, not adjacent tracts.

In this case, I conclude that the *Bomar* test for IRNE is not satisfied. The third element required for IRNEs is that there be a general plan or scheme of development for the designated land or tract, which, in this case, would have to be applicable to the three tracts as a whole. *See Bomar*, 270 S.C. at 679–680, 244 S.E.2d at 310. Evidence of such a general plan must, as must evidence of any of the *Bomar* elements when an IRNE is claimed, be "plain and unmistakable." *Id.* Westin points to a number of documents to support its claim of a general scheme of development: (1) the November 1983 joint venture agreement forming Barony, which according to Westin, "envisioned a deliberate, systemic development of the original parcel prior to its subdivision into the Barony Tract, Mid–Rise Tract, and Hotel Tract," (2) 1984 minutes of Barony's Management Committee discussing development on the

Hotel and Barony Tracts, and (3) the 1985 Redemption Agreement whereby the interest of Hilton Head Hotel Company (HHHC) in Barony was redeemed but which also stated that Barony and HHHC would cooperate in the development of [the tracts] in accordance with the "site plan." Moreover, the record also reflects an unrecorded development sketch of the three tracts called the "403 Master Plan," upon which no action was taken.

With the exception of the 1983 joint venture agreement, the evidence to which Westin points took place after the execution of the 1983 Restrictions, which does not totally remove its relevance, but which lessens its effect when the case is viewed as a whole. *Cf. Edwards v. Surratt*, 228 S.C. 512, 518–19, 90 S.E.2d 906, 909 (1956) (adding emphasis to the statement that a general plan must be inaugurated *before any lots are sold*); *Evans v. Pollock*, 793 S.W.2d 14, 21 (Tex.Ct.App.1989), *reversed*, 796 S.W.2d 465 (Tex.1990) (noting that the general scheme or plan cannot be implemented retroactively, and that any implied covenants attached when the plan was "implemented" through sales).[1] Moreover, at no time was a master plat of all three tracts prepared. *Cf. Bomar*, 270 S.C. at 678, 244 S.E.2d at 310 (refusing to find a IRNE and reasoning, in part, that "no master plat was ever made of the . . . tract."). At best, the evidence in this case supports the finding that a general scheme of development existed for each tract individually, and not for the three tracts as one planned development. For example, in *Duvall v. Ford Leasing Dev. Corp.*, 220 Va. 36, 255 S.E.2d 470 (1979), a company developed the Belle Haven tract in stages over some thirty years, before it conveyed the remaining undeveloped portion to a new developer. A part of this portion sold to the new developer was purportedly conveyed without the residential restrictions placed on all the lots previously sold by the former developer. *Id.* The Virginia Supreme Court, in responding to a claim of IRNE by residential property owners in Belle Haven, stated:

---

1. I note that the Texas Supreme Court reversed the cited opinion and rejected the proposition in the parenthetical in a limited fashion, by stating that "we attach no significance to the fact that two lots were sold without restrictions before the owners formulated their general scheme or plan of development." *See Evans v. Pollock*, 796 S.W.2d 465 (Tex.1990).

As has been noted, Belle Haven was developed in stages, the various sections having been created from time to time over a period of many years by the recordation of a number of deeds of dedication and plats. We believe that each of these recordings created a separate and distinct subdivision, with its own set of restrictions benefiting and burdening only the land in that particular subdivision. While the restrictions imposed in each dedication were similar to those applicable to other sections of the development, the course of conduct pursued by the developer did not indicate an intention to establish, as among the owners of lots in different sections, reciprocal benefits and obligations entitling the owner of property in one section to enforce a restriction against the owner of property in another section.

*Id.* 255 S.E.2d at 473. I believe that in this case, as in *Duvall,* the restrictions placed on each tract benefitted and burdened only that tract as a separate subdivision. The 1983 Restrictions expressly state that they inure to the benefit of owners of the Barony tract itself. No express reference in the restrictions gives an owner of any other tract the right to enforce restrictions on a different tract, and I do not find evidence of an intention for such a right to exist sufficient for it to be implied here.[2] *See also Surratt,* 228 S.C. at 525, 90 S.E.2d at 912 (reaching the conclusion that, since "there were set up separate and distinct units within the large area ... rather than a single development of the entire area according to any general scheme or plan, ... effect will be given to the restrictions as it may be determined they relate to the separate units, with the right of property owners in each unit to enforce them *inter se."*). *Cf. Ferrell v. Simmerly,* 812 S.W.2d 228, 230 (Mo.Ct.App.1991) (noting, that due to the presence of commercial restrictions in some areas and residential restrictions in others, that "at most, the various restrictions evidence that a general scheme of development existed only as to each individual block.").

---

**2.** Unlike the document memorializing the restrictions on the Barony Tract, the 1983 deeds from HHC to Barony passing title to the Hotel Tract and the adjacent Mid–Rise Tract only state that their covenants "inure to the benefit of and are enforceable by [HHC]." No provision in either of those deeds gives a right of enforcement to the owner of a different tract.

Having concluded that Westin could not enforce the 1983 restrictions in any event, I now turn to the effect of the bankruptcy proceedings on the 1985 covenants that Barony placed on the Barony Tract when it granted a deed to HHHC.

## II. 1985 RESTRICTIONS

Initially, it must be determined whether Westin, as it argues, is entitled to enforce the 1985 restrictions. A restrictive covenant runs with the land, and is thus enforceable by a successor-in-interest, if the covenanting parties intended that the covenant run with the land, and the covenant touches and concerns the land.[3] *Houck v. Rivers*, 316 S.C. 414, 450 S.E.2d 106 (Ct.App.1994); *Charping v. J.P. Scurry & Co.*, 296 S.C. 312, 372 S.E.2d 120 (Ct.App.1988) (citing *Epting v. Lexington*

---

**3.** The first *Restatement of Property* requires privity for a covenant to run with the land at law. First, horizontal privity is required for the burden to run, which means that the two covenanting parties must have transferred some interest in the lands burdened or benefitted at the time they entered into the covenant. *Restatement of Property* § 534 (1944). *Leighton v. Leonard*, 22 Wash.App. 136, 589 P.2d 279 (1978). Powell states that if one's viewpoint is that restrictive covenants are disfavored, then the privity requirement should be retained as an impediment to a covenant running with the land. 5 R. Powell & P. Rohan, *Powell on Real Property* ¶ 673[2], at 60–76 (rev. ed. 1996). While I have not found any South Carolina case which discusses this requirement, South Carolina caselaw has repeatedly stated that covenants are disfavored as impediments to free alienability. *Cf., e.g., Charping v. J.P. Scurry & Co.*, 296 S.C. 312, 372 S.E.2d 120 (Ct.App. 1988). However, the tentative draft of the new Restatement totally abandons the horizontal privity requirement, in line with other modern authorities. *Restatement (Third) of Property* § 2.4 (Tentative Draft No. 1, 1989). *See Moseley v. Bishop*, 470 N.E.2d 773, 778 n. 1 (Ind.Ct.App. 1984). In any event, this element is satisfied here, as Barony and HHHC were grantor and grantee at the time of the 1985 conveyance. Horizontal privity is not required for the benefit to run.

Second, vertical privity, of course, is required. A successor of the covenantor must hold the entire durational interest in order to be bound. However, the benefit runs to any succeeding possessory estate. *Restatement of Property* § 535 (1944). These elements are also satisfied in this case.

Third, notice to a grantee of the covenantor is required in order for a covenant to run with the land. *See Harbison Community Ass'n v. Mueller*, 319 S.C. 99, 459 S.E.2d 860 (Ct.App.1995) (noting that "a covenant is enforceable against a subsequent grantee, even if not in the grantee's deed, if the grantee has actual or constructive notice of the covenant."). There is no dispute over notice.

*Water Power Co.,* 177 S.C. 308, 181 S.E. 66 (1935), and *Cheves v. City Council,* 140 S.C. 423, 138 S.E. 867 (1927)).

First, Westin argues that intent is obvious in that the document states that the covenants are to run with the land, and, indeed, Marathon admits as much in its brief by stating that, "clearly, on the face of the covenants . . . , [they] were to run with the land." Marathon does argue, however, that the evidence is insufficient to show the covenanting parties' intention that Barony's successors in the Hotel and Mid–Rise Tracts may enforce the covenants, since the covenants do not refer to any other property as the benefitted dominant estate. *Cf. Charping,* 296 S.C. 312, 372 S.E.2d 120 (finding a lack of intention in the language of the deed for a covenant to run with the land, as "the covenant does not refer to Townsend's remaining property, nor does it indicate that it should benefit her heirs, successors, and assigns."). Unlike *Charping,* however, the language of the covenant here expressly states that the covenants run with the land. Barony retained two adjacent tracts and conveyed the Barony Tract subject to new restrictions. I would hold these covenants were for the benefit of the land that Barony retained and not merely for the benefit of Barony or the Barony Tract.[4]

Second, with regard to the requirement that the covenant touch and concern the affected properties, Westin argues that it only needs to show that the burden touches and concerns the Barony Tract, and not that the benefit touches and concerns the Hotel Tract. However, the "touch and concern requirement is applied separately to the burden and the benefit of a covenant." 5 R. Powell & P. Rohan, *Powell on Real Property* ¶ 673[2], at 60–49 (rev. ed. 1996). Marathon does not attempt to argue that the covenants do not touch and concern the Barony Tract; however, it does contend that the benefit of the covenants does not touch and concern the Hotel

---

4. Admittedly, the deed does not expressly refer to the Hotel Tract and the Mid–Rise Tract as the dominant estate. However, I believe the obvious intention is that Barony placed the 1985 restrictions on the Barony Tract in order to benefit the Hotel and Mid–Rise Tracts, which Barony retained. Thus, the enforceability issue is different here than in the 1983 restrictions. In this situation, Westin stands in the shoes of Barony as the grantor, who clearly executed these restrictions for the benefit of the parcel which Westin now owns. Accordingly, I would hold that the benefit ran with the Hotel Tract and the Mid–Rise Tract.

Tract. According to the generally accepted test, the benefit of a covenant meets the touch and concern requirement if "the covenantee's legal interest in land is rendered more valuable by the covenant's performance." *Id.* at 60–48. *See also Epting v. Lexington Water Power Co.,* 177 S.C. 308, 181 S.E. 66 (1935) (citing *Rosen v. Wolff,* 152 Ga. 578, 110 S.E. 877 (1922)). The 1985 covenants on the Barony Tract in the deed from Barony to HHHC consist of a density limitation, a building height limitation, and a prohibition against erection of a beach club on the Barony Tract. It is plainly evident that these restrictions enhance the value of the Hotel Tract by limiting the development on the adjacent Barony Tract. *Cf.* 5 R. Powell & P. Rohan, *Powell on Real Property* ¶ 673[2], at 60–49—60–50 (rev. ed. 1996) (citing for the proposition that building height restrictions "touched and concerned both sides," *Leighton v. Leonard,* 22 Wash.App. 136, 589 P.2d 279 (1978)).

Thus, assuming the trustee's sale of the Barony Tract was not otherwise free of the 1985 restrictions, then Westin would be entitled to enforce them as covenants running with the land.

## III. FREE AND CLEAR BANKRUPTCY SALES

For perspective, I begin with a review of the bankruptcy law applicable to the sale of the debtor's property by a bankruptcy trustee. Pursuant to 11 U.S.C. 363(b) & (c) (1993 & Supp.1996), the court must give notice and hold a hearing only if a trustee's proposed sale of the debtor's property is outside of the ordinary course of the debtor's business. In either event, 11 U.S.C. 363(f) (1993 & Supp.1996) provides that:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

None of the bankruptcy orders in the record specifically state which portion of 363(f) justified sale of the Barony Tract free and clear of restrictions, so review of 363(f) is necessary to determine if the restrictions could have been removed pursuant to this subsection.[5]

In 363(f), the word "interest" is a broad category which includes "liens" as well as other interests. *See In re Taylor,* 198 B.R. 142 (Bankr.D.S.C.1996) (noting that liens must be included within the broader term "interest," because "lien" is defined in the Bankruptcy Code while "interest" is not, and 363(f)(3) implies inclusion by applying the aggregate value rule "when such interest is a lien."). While the restrictive covenants at issue here are not "liens," they do fall within the definition of "interest in ... property." *See, e.g. Gouveia v. Tazbir,* 37 F.3d 295 (7th Cir.1994) (noting that while restrictive covenants have "characteristics of both a contract and an interest in real estate, the primary nature of such covenants is not contractual but rather a property interest"); *In re 523 East Fifth St. Hous. Preservation Dev. Fund Corp.,* 79 B.R. 568 (Bankr.S.D.N.Y.1987). Thus, all of the 363(f) criteria could possibly apply to a restrictive covenant except for (f)(3), which by its terms only applies to "liens."

Of the remaining criteria in 363(f), the trustee's sale, if free and clear, could only have been accomplished with consent pursuant to 363(f)(2). First, 363(f)(1) is not applicable because state law does not permit a sale free and clear of the 1985 restrictions. As discussed previously, the 1985 restrictive covenants run with the land, and are, at least on their face, enforceable by and against successors. Restrictive covenants generally cannot be extinguished absent a substantial change in the character of the neighborhood which would render the covenant valueless to the covenantee and oppressive to the

---

**5.** The majority states that this issue is not preserved for review because the special circuit judge did not rule upon it. I would hold, nevertheless, that the question of the bankruptcy trustee's statutory authority to sell property free of a state law interest is jurisdictional.

covenantor.[6]  *See Flinkingshelt v. Johnson,* 258 S.C. 77, 187 S.E.2d 233 (1972); *Dunlap v. Beaty,* 239 S.C. 196, 122 S.E.2d 9 (1961).  The record does not reflect any evidence to support extinguishment.  *Cf. In re Pintlar Corp.,* 187 B.R. 680 (Bankr.D.Idaho 1995) (nonbankruptcy law does not permit sale of property free of "dumping easements"); *523 East Fifth St.,* 79 B.R. at 570–575.  (holding that restrictive covenant could not be extinguished under applicable statutory and common law).

Second, the restrictions were not subject to a bona fide dispute involving the debtor, so 363(f)(4) does not apply.  *Cf., e.g., Missouri v. United States Bankruptcy Court,* 647 F.2d 768 (8th Cir.1981), *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982) (holding that "the bankruptcy court should particularly examine its authority to order the sale [free and clear] if ... any bona fide dispute exists only between third parties.").

Third, Barony, as an entity entitled to enforce the restriction, could not be compelled in a legal or equitable proceeding to accept a money satisfaction for loss of the benefit of the restrictions at issue here.  A party seeking a remedy for breach of a restrictive covenant may ask for money damages at law, but the party also may seek an injunction in equity, which affords the best remedy since it prohibits future violations.  *See Gouveia,* 37 F.3d at 299 (noting that landowners attempting to enforce a covenant cannot be "forced to accept money damages in lieu of equitable relief."); *In re WBQ Partnership,* 189 B.R. 97, 106 (Bankr.E.D.Va.1995) (noting that the only adequate remedy for repeated violations of a restrictive covenant is an injunction).  *Cf. Houck v. Rivers,* 316 S.C. 414, 450 S.E.2d 106 (Ct.App.1994) (noting that "the right of a plaintiff to an injunction to enforce restrictive covenants has long received special treatment.").  Thus, Barony could not be *compelled* to accept a money satisfaction of its interest, and 363(f)(5) is not applicable.  Accordingly, this property could have been sold free and clear of the 1985

---

6.  Real covenants may be extinguished under state law by operation of doctrines similar to consent, such as modification, release, waiver, estoppel, and acquiescence.  *See generally* 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* §§ 234–250 (1995).  Other grounds for extinguishment, such as merger, also exist.  *Id.*

restrictive covenants only if all entities entitled to enforce the restrictions consented.[7]

## IV. BARONY COMPANY'S CONSENT

The issue of whether Barony consented to sale free and clear of the 1985 restrictions is problematic. On one hand, Barony did file documents objecting to the proposed 1987 sale, but it later withdrew those objections once Marathon and the Trustee stipulated to the protection of ten very specific easements and license agreements. On the other hand, Barony did not sign the 1987 stipulations or anything else at that time, the 1987 orders do not expressly refer to Barony or its concerns, and Barony was not a party to any of the 1987 settlement agreements. Thus, Barony only could be said to have consented if the withdrawal of its objections after the stipulations regarding the specified interests constituted implied consent to removal of the 1985 restrictions.

A number of cases have held that a *creditor* who did not file a timely objection impliedly consented to a sale free and clear if the creditor had notice of the proposed sale. *See In re Elliot*, 94 B.R. 343 (E.D.Pa.1988); *In re Gabel*, 61 B.R. 661 (Bankr.W.D.La.1985). However, *Scheidel v. Lister*, 182 Cal. App.3d 657, 227 Cal.Rptr. 510 (1986), is a case involving issues more similar to the ones at bar. Scheidel, an attorney, represented the debtor's tenant in a bankruptcy proceeding and did not object to the sale of the debtor's building free and clear. Months after the trustee sold the debtor's property to Lister pursuant to a bankruptcy court order, Scheidel sought for his own benefit to have the state court establish a prescriptive easement over the same property. *Id.* The appellate court held that Scheidel had not impliedly consented, noting that "a casual or accidental ... participant who obtains knowledge of the proceeding by that means alone [cannot] be deemed to have consented to the sale of a claim which was not asserted, recognized, or otherwise directly involved in the proceeding." *Id.* 227 Cal.Rptr. at 514. The *Lister* court considered that Scheidel's knowledge of the sale "derived from

---

7. Marathon asserted that sale could have been justified pursuant to 11 U.S.C. § 365 (1993 and Supp.1996), which addresses unexpired leases and executory contracts. However, restrictive covenants are not executory contracts, and § 365 is inapplicable. *Gouveia*, 37 F.3d at 298–99.

the rather accidental event of his representing a tenant," which distinguished that case from one involving a "direct stakeholder in the bankruptcy proceeding." *Id.* 227 Cal.Rptr. at 513–14. Here, of course, Barony did file objections on its own accord, and under these facts it would be difficult to argue that Barony did not implicitly consent to extinguishment of the 1985 restrictions, if it is assumed that the order purported to vitiate those covenants. Thus, the effect of the bankruptcy proceedings must be determined in order to ascertain the validity of the 1985 deed restrictions.

## V. EFFECT OF LITIGATION IN BANKRUPTCY COURT

Essentially, there are two sets of bankruptcy proceedings which resulted in orders to which Westin may be bound, thus preventing it from seeking enforcement of the 1985 restrictions. First, there is the November 1987 bankruptcy court order authorizing the § 363 sale of the "Port Royal assets," "free and clear of all liens, encumbrances, or other interests." This order approved the sale of the Barony Tract to Marathon, "in accordance with ... the Marathon Settlement Agreement." The bankruptcy judge approved the settlement agreement between Marathon and the Trustee in a September 1987 order, which stated that "the Trustee is authorized and directed when appropriate to transfer the property of the estate under the terms of the Settlement Agreement."[8] The August 1987 Trustee's Report, "the purpose [of which was] to clarify the Agreement between Marathon ... and the Trustee," provided that "covenants, restrictions, [and] easements ... shall be treated as provided for under South Carolina law." It is thus problematic whether the 1987 orders, which were based on the Marathon settlement agreement, are properly

---

8. On September 30, 1987, HHC, HHHC, and other parties executed and recorded a release of all covenants and other interests in Grasslawn Subdivision No. 1, of which the Barony Tract is a part. Barony, which owned the Hotel Tract at this time and was entitled to enforce the 1985 restrictions on the Barony Tract, was not a party to this release, which was purported to be executed by "all of the parties in interest in and to the Rights affecting Grasslawn Subdivision No. 1." I disagree with the majority that Barony's substantial interest could be so casually disregarded when it was not made a party to the release as were all other parties in interest.

interpreted as conveying the property free and clear of the 1985 restrictive covenants. *Cf. In re Oyster Bay Cove, Ltd.,* 161 B.R. 338 (Bankr.E.D.N.Y.1993) (holding that order approving trustee's application to sell property free and clear of all "liens, claims, encumbrances, and rights" did not mean that the property was sold free and clear of nonmonetary restrictions which run with the land); *City of New Orleans v. Badine Land Ltd.,* 657 So.2d 770 (La.Ct.App.1995) (holding that a city was not precluded from asserting public right of way over property sold "free and clear" by trustee, as "a bankruptcy court order cannot extinguish a 'non-monetary restriction' which runs with the land.").[9] The November 1987 order authorizing the sale stated "that the Trustee . . . is authorized to sell or transfer the Port Royal Assets free and clear of all liens, encumbrances, and other claims (as set forth on Exhibit "A" hereto)." Importantly, Exhibit A does not include the restrictions and covenants at issue. While the order also stated that "all persons or entities who have failed to assert any lien, encumbrance, or other interest . . . are forever barred from doing so," the interests listed in Exhibit A to the order are, as best as can be discerned from the record, monetary interests, such as tax liens, mechanics' liens, and mortgages. Finally, the order stated, "that all valid liens, encumbrances, and other interests . . . be transferred to the proceeds of the sale of the Sea Pines assets." It is plain from the order that the "liens, encumbrances, and other interests" with which the order deals are monetary interests, not nonmonetary interests such as real covenants. Therefore, given the statement in the trustee's report about covenants, and since, in my view, the 1987 order only expressly addressed monetary restrictions, I am led to conclude that the 1987 bankruptcy court orders did not, on their face, purport to authorize conveyance of the Barony Tract free and clear of the 1985 covenants.

However, I concur with the majority that Westin is bound by the result in the second bankruptcy proceeding, which

---

**9.** Admittedly, the applicable documents in *Oyster Bay* and *Badine* expressly stated that the property was sold "as is" and subject to covenants of record; however, here, an analogous statement existed in the Trustee's report, as it states that "covenants . . . shall be treated as provided for under South Carolina law."

involved Marathon's adversary action against Barony seeking declaratory relief regarding the validity of the 1985 deed restrictions. This action was filed in early 1988, and, while the action was still pending, Barony sold the Hotel Tract to AOKI, the parent corporation of Westin. The sales contract between AOKI and Barony specifically referred to Marathon's action for declaratory relief, and it stated that the litigation "has long range economic consequences and does represent a possible means by which development of the adjoining property can be restricted." An attorney who was Westin's in-house counsel during this time testified at the hearing before Judge Kimmerlin that his company had "reviewed [the litigation] in great detail." Over a year after the October 1988 sale of the Barony Tract, Barony and Marathon entered into an agreement settling the litigation, and Barony executed a document which assigned its rights in the 1985 deed to Marathon. Barony also signed a written stipulation in which it admitted that, "while Barony .. chose to request protection of any interests it might have ..., it withdrew all such objections" to the trustee's sale after it achieved protection of the specified ten interests. Based on this 1989 stipulation, the bankruptcy court granted summary judgment to Marathon as contemplated by the settlement agreement. In that 1990 order, the bankruptcy judge quoted the entire restriction paragraph, but held that Marathon:

> received and currently has title to the 11.5 acre Barony Tract unencumbered by the restriction stated above *as to the number of units per acre* and that the proceedings in this case resulted in the extinguishment *of that restriction* as an encumbrance upon the 11.5 acre Barony Tract (emphasis added).

The judgment that was entered substantially tracked the quoted language.

Generally, of course, a stranger to a proceeding cannot be bound in subsequent litigation by a determination in the former proceeding. *Cf. First Nat'l Bank v. USF & G,* 207 S.C. 15, 35 S.E.2d 47 (1945). *See Fremont Indem. Co. v. Industrial Comm'n,* 144 Ariz. 339, 697 P.2d 1089 (1985). However, it is also the general rule that:

> A successor in interest of property that is the subject of a pending action to which his transferor is a party is bound by

and entitled to the benefits of the rules of res judicata to the same extent as his transferor, unless:

(1) a procedure exists for notifying potential successors in interest of pending actions concerning property, the procedure was not followed, and the successor did not otherwise have knowledge of the action; or

(2) the opposing party in the action knew of the transfer to the successor and knew also that the successor was unaware of the pending action.

*Restatement (Second) of Judgments* § 44 (1982). The rationale for this rule is as follows:

If property is transferred when an action is pending concerning it, the successor in interest may be aware of the litigation and seasonably join as a party, by intervention or by substitution in place of his transferor. In that circumstance, the successor then becomes bound because he is a party. If he is aware of the litigation but does not join as a party, he acquiesces in the transferor's continuing, for purposes of the litigation, to be the apparent owner of the interest in the property. His doing so is in effect treating the transferor as his representative in the action.

*Restatement (Second) of Judgments* § 44 cmt. a (1982). There is no question that Westin had notice of the litigation between Barony and Marathon. Essentially, Westin acquiesced in Barony continuing to litigate the right of the owner of the Hotel Tract to enforce the 1985 deed restrictions against the owner of the Barony Tract. The record does reflect that Marathon requested Westin's consent to the settlement, and that Westin refused, writing that it did "not believe a settlement can be reached without [Westin's] consent." Unfortunately for Westin, it had an obligation, if it was unhappy with Barony's negotiated settlement, to do more than merely sit on the sidelines. As a purchasing party with notice that litigation was pending which involved an interest it was potentially entitled to enforce, Westin should have intervened, if the parties to the suit failed to join or protect it. Bankr.R. 7024. Thus, Westin is bound, by the principles of res judicata, to the result of the 1990 order. *See also* 50 C.J.S. *Judgments* § 810 (1947).

However, the 1990 bankruptcy order and the judgment from that order only expressly hold that Marathon owns the Barony Tract free and clear of the "density restriction" in the 1985 deed. Since I conclude that the 1987 orders did not affect the 1985 deed restrictions, but that Westin is bound by the 1990 order, then in my view Westin is still entitled to enforce the beach club prohibition and the height limitation in the 1985 deed. Accordingly, I would hold that Marathon remains subject to those two restrictions.

## VI. CONCLUSION

I agree that Westin cannot attempt to enforce the 1983 restrictions under the theory of implied reciprocal negative easements. However, I would hold that portions of the 1985 restrictions are still enforceable, because, in my view, the 1987 orders did not affect the validity of the 1985 deed restrictions, and the 1990 order, to which Westin is bound, only extinguished the density restriction.