### 20273

CIRCLE SQUARE COMPANY and Lois H. Richardson, Appellants, v. ATLANTIS DEVELOPMENT COMPANY and Alton E. Jones, Individually and as partners comprising Atlantis Ventures, and Atlantis Ventures, Respondents.

(230 S. E. (2d) 704)

*Messrs. J. Fred Buzhardt, Jr.* and *William W. Jones, Jr.,* of *Dowling, Dowling, Sanders & Dukes, Hilton Head Island, for Appellants,*

*Messrs. Eugene F. Rogers, of Rogers, McDonald, Mc-Kenzie and Fuller,* Columbia, *and Randolph Murdaugh, III, of Murdaugh, Peters and Murdaugh,* Hampton, *for Respondents,*

August 18, 1976.

GREGORY, Justice:

This is an action in equity commenced on or about August 5, 1975, in the Court of Common Pleas for Beaufort County, seeking permanently to enjoin the construction of a shopping area by respondents on property subject to restrictive covenants running with the land. The lower court denied relief. We reverse.

In 1956, The Hilton Head Company was the owner of what is now generally known as the Forest Beach Subdivision of Hilton Head Island, South Carolina, and at that time, executed and recorded a Declaration of Covenants (hereinafter "Declaration") with respect to the land in the said Forest Beach Subdivision. By its Declaration, The Hilton Head Company established a plan or scheme of development for the property, dividing the property into five (5) categories according to usage, to wit: residential, semi-residential and commercial categories for private use, and roadside areas and parks for public use. In addition to defining the several types of areas and designating the property placed in each use category, various restrictions were placed upon each of the use categories. The restrictive covenants were specifically declared to run with the land and to be enforceable by persons who subsequently acquired property within the subdivision.

The subdivision plan set forth in the Declaration is so designed that the "semi-residential" areas lie and form a buffer between the residential areas and the commercial areas. The residential areas are restricted to single family dwellings. "Semi-residential" is defined in the Declaration as "buildings in the nature of motels, multiple-unit apartment houses and any accompanying facilities, such as restaurants and swimming pools."

The Declaration provides that the restrictions imposed by the Declaration may be changed by written consent of the owners of the two-thirds (2/3) of the acreage in the subdivision.

Respondent Atlantis Development Company acquired title to land on the west side of Forest Drive subject to the semiresidential restrictions on which they have constructed a 72-unit condominium complex. Respondents contemplate selling these units as condominiums but under present circumstances are renting a portion by the day, week, or month.

Respondents also own The Adventure Inn, a motel, located across the street from the condominiums, on the east and ocean side of Forest Drive. They propose to construct a shopping center called "Saltaire Village" composed of sixteen (16) buildings across the street from The Adventure Inn, in front of their condominiums. Under proposed plans, the following businesses will operate in the shopping center: a men's wear shop, a ladies' wear shop, a gift shop, an antique shop, a beauty shop, a candy and ice cream store, a children's clothing shop, a gift and towel shop, a shoe shop, a sports shop, a needlepoint shop, a gourmet food, wine and spirits shop, a restaurant and supper club, a country kitchen restaurant, the business office of respondents and a real estate agency.

The area designated "semi-residential" has been substantially developed since 1956, and on such areas there now exist more than two thousand motel, hotel or multi-unit

apartment house units. There are restaurants and swimming pools associated with the hotels and motels.

In addition, various "business" type enterprises have operated or are operating within the semi-residential area, ranging from a par three golf course to a lawyer's office. The most significant, by far, of such enterprises is a shopping area operated for an undertermined number of years in connection with The Hilton Head Inn by The Sea Pines Company. No court action has been previously brought to enforce the restrictions established by the Declaration of The Hilton Head Company. In 1968, however, The Sea Pines Company commenced construction of a dry cleaning service establishment in the semi-residential area, and under threat of litigation, the construction was discontinued and a portion of the improvements were removed from the site.

In the Declaration, The Hilton Head Company reserved the right to prior approval of all architectural plans, specifications, construction materials and location before construction of any building or structure on the restricted areas. Subsequent to the commencement of the action, respondents obtained this approval for its proposed shopping center.

By agreement of the parties, the matter was submitted to the court upon an agreed stipulation of fact and issues. The issues submitted were whether the proposed use by respondents constituted an allowed usage of the property under the semi-residential restrictions imposed by the Declaration of The Hilton Head Company, and if not, were the appellants barred by laches, waiver or estoppel from asserting objections to such use.

The court below found that the use proposed by respondents was an allowable one in the area designated semi-residential, and denied injunctive relief. In so concluding, the court below relied on the approval of the architectural standards of respondents' plan by The Hilton Head Company, and the operation of the shops on the premises of The Hilton

Head Inn as demonstrating the interpretation placed on the covenants and restrictions by the parties to the contract.

Appellants contend that the proposed shopping center is not an allowable usage of that portion of Forest Beach designated as semi-residential. We agree. In construing the allowable usuages under this restriction the Court must consider the entirety of the Declaration. *Sprouse v. Winston,* 212 S. C. 176, 46 S. E. (2d) 874 (1948), especially where, as here, there are several categories of restriction. An examination of all is necessary to ascertain the total scheme.

From an examination of the Declaration and exhibits showing the relative locations of the various categories of restrictions, it is inescapable that the plan established three categories for private use, to wit: residential, semi-residential, and commercial. Reference to the plats shows clearly that the semi-residential areas lie between the residential areas and the commercial areas, forming a buffer between them.

The residential areas are restricted by the Declaration to one detached single family dwelling, not to exceed two and one-half stories and a private garage which can include servant's quarters.

As noted above, "semi-residential" is defined in the Declaration as "buildings of the nature of motels, hotels, multiple-unit apartment houses and any accompanying facilities, such as restaurants or swimming pools."

No specific definition is included in the Declaration for "commercial" in the part of the Declaration dealing with commercial areas, but some of the restrictions contained therein shed light on the intention. For example, in prescribing restrictions applicable in the commercial area, the Declaration repeatedly uses the terms "shops or other business establishments." Every reference to the enterprises to be contained in the commercial areas commences with "shops."

Also, the Declaration provides that no more than fifty (50%) percent of the total area in any tract restricted commercial may be utilized for enclosed and/or covered commercial buildings or facilities of any kind, and that the remainder shall be available for landscaped grounds and gardens, swimming pools, walkways, vehicular parking, outdoor recreational facilities and similar facilities. No such space limitations are imposed by the Declaration on semi-residential areas.

If the Declaration were construed to permit a shopping center to be constructed and operated in semi-residential areas, there would be no applicable prohibition in the Declaration to preclude up to one hundred (100%) percent of a given tract from being utilized for a building, except for minimum setback-from-streets requirements. Considering the very elaborate development scheme, obviously devised to insure a major retention of open spaces and to avoid high density development, even in commercial areas, such a construction of the Declaration would not only be strained, but clearly contrary to the expressed scheme of the declarants.

Consideration of the entire Declaration, and the scheme of development, demonstrates an intention for the "shops" to be in the commercial areas, and for businesses to be confined to the most remote areas in relation to the residential areas. Thus, the only allowable method for locating a shop in the semi-residential area is for that shop to qualify as an "accompanying facility" to an inn such as a restaurant or swimming pool. While several additional shops easily come to mind as accompanying facilities to an inn or motel, such as beauty parlors and sundry shops, the nature of the facility as well as its proximity to the inn is relevant.

Respondent's proposed shopping center is to be located across a four-lane highway from its motel facility, The Adventure Inn. It is to be in front of respondents' condominiums, temporarily in use as additional facilities for The Adventure Inn, but scheduled to be sold to individual owners

when the economy improves. The sixteen varied businesses to be housed in the shopping center represent nothing less than a diversified commercial shopping center, predominated by specialty shops. Although these shops would undoubtedly be attractive to visitors at the inn, no functional or physical relationship to The Adventure Inn inheres in the shops such as would qualify them as "accompanying facilities" to the inn, allowed under the restriction.

To construe the scheme of development in a manner that would include a shopping center as being encompassed by the term "accompanying facilities" as used in the definition of semi-residential areas would not only be in conflict with the expressed scheme of the declarants, but would also negate the very purposes of this very deliberate plan for the development of the subdivision.

The reliance by the lower court on the fact that the proposed shopping center is in substance the same as one currently operated by The Sea Pines Company is error. The scheme of development is not ambiguous and requires no resort to matters not within the four corners of the Declaration. Appellants and respondents have agreed that the present shopping center on the premises of The Hilton Head Inn is a major deviation from the terms of the restriction covenant. However, it is also clear that it is the only main deviation in an otherwise uniform pattern of motel, hotel, and multi-unit apartment development.

Further, we find the lower court erred in its reliance on the approval by The Hilton Head Company of the plans for the proposed shopping center as evidence of interpretation placed in the restrictive covenants by the parties to the contract.

First, resort to the construction of a contract by a party to it is only done where the contract is ambiguous or there is doubt as to the intended meaning of the contract. As pointed out, the covenants and scheme of development involved here leave no doubt that respondents'

16-unit shopping center was not an intended use of land in the semi-residential areas.

Secondly, approval of plans for construction of the shopping center by The Hilton Head Company was not an approval of use of restricted land but rather an exercise of the company's reserved right to review architectural standards. Reservation of the right of prior approval in the Declaration, the exercise of which the lower court relied on follows:

2. No building, structure, or accompanying facility of any kind, including signs or other forms of advertising, shall be erected, placed, or altered on any lot until architectural plans, specifications, construction material and location have been approved in writing by The Hilton Head Company, its agent, successors, or assigns, or The Hilton Head Land Company, if title was any time held by such company. Primary consideration in granting or refusing such approval shall be: Quality of design, workmanship and materials; harmony of external design with existing structures, landscaping plan and location with respect to topography and finish grade elevation, as well as any other appropriate and reasonable considerations. If The Hilton Head Company or The Hilton Head Land Company, as appropriate, their successors or assigns, do not act on an application made to them for approval within thirty (30) days after submission, such application shall be deemed approved. This 30 day automatic approval period shall not be applicable unless the applicant presents written evidence of the date of submission to the appropriate company.

The above provision of the Declaration does not even address the issue of use. The Declaration imposed two restrictions of the various areas, one as to use and one as to architecture. It is clear the approval relied on by the court is one of architectural standards and is of no relevance in determining uses in contemplation of the declarants in "semi-residential areas".

The second issue on appeal is whether appellants are barred from bringing the suit by laches, waiver, or estoppel. Although there are technical differences in the doctrine of laches, waiver and estoppel, as applied in equitable actions for enforcement of restrictive covenants, all are affirmative defenses, and the budren of proof to establish the elements necessary to give rise to a defense of laches, estoppel or waiver is on the party who seeks to be protected by such a defense. *Wallace v. Timmons,* 232 S. C. 311, 101 S. E. (2d) 844 (1958); *Frady v. Smith,* 247 S. C. 353, 147 S. E. (2d) 412 (1966). The essential difference arises in whether the affirmative defense is based on passivity (laches) or an affirmative act (waiver or estoppel). In this case, the respondents have neither alleged nor proved any affirmative act by appellants, but base their alleged defense on the passiveness of appellants.

Although the violations of the covenants in the form of retail shops in the semi-residential area have been, according to the stipulation, in existence for some time; there is no showing that they commenced prior to 1963, at which time respondent Atlantis Development Company acquired the property on which respondents propose now to build their shopping center. There is no evidence to support a reliance by respondents on the permissibility of retail shops in the semi-residential areas of the subdivision. In no way have respondents made any showing that the passivity of appellants with respect to the other retail stores in the area has led respondents to change their position adversely, whether by incurrence of expense or otherwise.

In *Pitts v. Brown,* 215 S. C. 122, 54 S. E. (2d) 538 (1949) at page 132 the Court found that there was a general scheme of development contained in the restrictive covenants and previous violations of those covenants. There the Court stated the law in this State as follows:

But the violation of some of the restrictions by some of the purchasers of lots in the tract, without action by appel-

lant, does not affect his right to enforce the restrictions against the respondents. *Snow v. Van Dam,* 291 Mass. 477, 197 N. E. 224; *Bacon v. Sandberg,* 179 Mass. 396, 60 N. E. 936.

In discussing the degree to which the non-conforming development may proceed without precluding the enforcement of the covenants by a court of equity, the Court in *Pitts v. Brown, supra,* 215 S. C. at page 133, 54 S. E. (2d) at page 543, further stated:

As was said in *Rombauer v. Compton Heights Christian Church,* 328 Mo. 1, 40 S. W. (2d) 545, 553: "No hard and fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be safely asserted the changes must be so radical as practically to destroy the essential objects and purposes of the agreement." See also 14 Am. Jur., Covenants, etc., Sec. 305, pp. 648, 649, 26 C. J. S., Deeds, § 171, p. 575.

Excluding the shopping complex at The Hilton Inn, the only establishments presently doing business in the semi-residential area which are not located within one of the inns are: (1) "The Arcade"—consisting of electronic games and concession operations; (2) Palmer and Coy—insurance brokerage office; (3) Island Vacations—villa and vacation home rental agency; (4) Design House—interior decorating service; (5) Atlantis Devolpment Company Corporate headquarters and real estate sales office; and (6) Baptist Church. The other shops listed in the exhibits no longer operate in the area or are contained within the inns themselves. We do not consider the businesses within the inns. A review of the list (bars, liquor stores, sundries shops, beauty salons, real estate offices, camera shop) reveals most to be functionally related to the inns and this functional relationship together with physical proximity qualifies these as allowable accompanying facilities. We find the non-functionally related businesses, to wit: three real estate offices, are negligible in destruction of the visual design created by the restrictive

covenant because of their enclosure within the inn and negligible in effect on the functional design because of their minimal number.

A study of the record convinces us that even the existence of the shopping complex at The Hilton Head Inn together with the other five businesses located within the restricted area have not imposed such a radical change in the area that the object and purpose of creating a buffer zone between strictly residential and commercial has been destroyed. Equity will enforce restrictive covenants made for the benefit of an owner's land if they remain of substantial value, even though because of changed conditions, a hardship will be visited on the servient estate. Berry, Restrictions, etc., § 405, p. 547; 32 C. J. S. § 328, p. 212. In this instance, a hardship will be worked on respondents whose proposed shopping center was needed to compete with that of The Hilton Inn on whose premises the aforementioned complex already exists. However, there are other property owners buying under and depending on the restrictive covenants regimenting development of their property. Not only are land-owners in the semi-residential area vitally affected by commercial development in their area, unhampered by commercial restrictions, but so are the landowners in the residential and commercial areas on either side. This Court cannot endorse a change while the development scheme accomplished by the restrictive covenants is still useful and working.

Hilton Head Island has been developed as a pleasing and appealing resort and retirement community, and the success of the Island's development is due in no small part to careful planning of development and enforcement of that planning through restrictive covenants. All the property owners have a vested interest in the continued enforcement of the covenants applicable to the subdivisions on the Island, for upon them largely depend the values of their property. If they wish to change the restrictions and use of their property, the

Declaration itself provides this can be accomplished by written consent of two-thirds of the acreage. They can accomplish a change if no one seeks to enforce the covenants. However, when one protected by a covenant seeks enforcement thereof, we cannot endorse change while the developmental scheme is still viable, while the benefits conferred by the scheme are still present.

Reversed.

LEWIS, C. J. LITTLEJOHN, J., and JOSEPH R. MOSS, Acting Associate Justice, concur.

NESS and RHODES, JJ., disqualified.