GRIFFIN, C.J.,
dissenting.
This case involves the failure of both the lower court and this court to enforce a restrictive covenant establishing a twenty-five foot rear setback for a subdivision in Her-nando County called “Spring Hill.” The Spring Hill subdivision was developed in 1969 by the Deltona Corporation. In 1986, the Spring Hill Civic Association, Inc. [“SHCA”] succeeded by assignment to the covenant enforcement authority of the developer. Currently, there are between 25,000 and 30,-000 homes in this subdivision. The SHCA, which operates mostly with volunteers, has established an architectural review committee [“ARC”] to review plans for compliance with the covenants prior to construction being undertaken. All building permits issued by Hernando County for construction in the Spring Hill subdivision are stamped with a legend informing the applicant of the existence of the deed restrictions and giving the address and telephone number of the SHCA. With the exception of the rear setback, twenty-five feet for the subdivision, but twenty for the county, the setback requirements of the subdivision and Hernando County are the same.
In 1996, the appellees, Stephen and Terry Paolella, New York residents, purchased a lot in Spring Hill. In early December 1996, their builder, Pastore Construction, pulled a county building permit for a custom home. Pastore also submitted a signed application for approval by Spring Hill’s ARC with an attached site plan. The plan showed a home of approximately 4,000 square feet total and 3,000 square feet of living space, designed in a courtyard style with an enclosed pool. Joseph Pastore, the principal of Pastore Construction, had built over 225 homes in Spring Hill over many years, yet he claimed to be unaware of the twenty-five foot setback. He explained that he usually built such small homes that he complied with the setback restrictions without “even knowing what they were.” Mr. Pastore also testified that the Paolella home, as designed, would be too big to be placed on the lot without violating the setbacks.
On December 20, 1996, someone from the SHCA telephoned the Paolellas at their New York home to inform them about the setback requirement and the fact that their proposed new home was in violation of the deed restriction setback. Mr. Paolella testified that he did not think this was a “serious” call; nevertheless, after speaking to the SHCA representative, he called the title company, *377 verified that indeed there were deed restrictions affecting construction and asked for a copy to be sent to him. Also, on December 20, 1996, the SHCA president, Gordon Col-vin, left a message on Mr. Pastore’s answering machine at work advising him to contact the SHCA regarding the rear setback because, as reflected on the site plan submitted by Mr. Pastore, the twenty-five foot rear setback would be violated, in one portion by as much as six feet.
Pastore testified that he engaged in “phone tag” with the SHCA for the next three days. On December 23, however, a representative of the SHCA spoke directly with a woman in Pastore’s office and explained the deed restrictions to her. On December 24, Mr. Colvin hand-carried a copy of the deed restrictions to Pastore’s office along with a new application. By letter dated Friday, December 27, 1996, the SHCA’s attorney advised the Paolellas, in writing, of the deed restriction violation and informed them that litigation would ensue if they proceeded with construction. This letter to the Paolellas was misaddressed and not received by them until sometime in January. However, a copy of the letter was also faxed to Pastore on the 27th. He testified that because of his holiday schedule, he did not see the letter until Monday, December 30. Nevertheless, in spite of his “holiday schedule” and in the face of the rear setback warning, on Saturday, December 28,1996, Pastore had the slab for the Paolella residence poured. At his client’s request, however, Pastore thereafter ceased construction. Pastore and the Paolellas then sought permission of the SHCA to be relieved of the setback requirement. When this was refused, they simply decided to recommence construction. They apparently elected this course because they were aware that there were other unenforced covenant violations within Spring Hill and that other residents had received waivers of certain restrictive covenant requirements. Therefore, they reasoned, the rear setback requirement could not be enforced against them. This position is summarized in a letter from the Paolellas’ counsel to the SHCA’s counsel:
As I have discussed with you, I do not believe the Civic Association can rely upon the deed restrictions if it has not uniformly enforced those same deed restrictions. Selective and arbitrary enforcement can invalidate deed restrictions.
On January 8, 1997, the SHCÁ filed suit against the Paolellas alleging entitlement to both a temporary and a permanent injunction. The Paolellas' advised the SHCA that if they intended to seek a temporary injunction, they should do so before the Paolellas recommenced construction. The SHCA did not schedule a hearing for a temporary injunction. The Paolellas’ home was completed in early July. In August, the case went to trial on the permanent injunction. The trial court declined to énter an injunction in favor of the SHCA concerning the setback violation. The order is lengthy. In essence the lower court’s' reasoning for refusing to issue the injunction falls into three principal categories: first, that this setback is not enforceable because, by “not pursuing relief against other homeowners who have setback violations,” a “precedent has been established.” Second, even though suit was promptly filed, the SHCA “slept on its rights” by failing to seek a temporary injunction order forcing the Paolellas to stop construction. Third, after finding that the SHCA did not have the power to waive “minor” setback infractions, the court found this one to be “minor” and therefore entitled to waiver. Having thus refused to enforce the restrictive covenant, the court attempted to limit its ruling to “the unique and special facts and circumstances of this cause.”
I dissent because, after reading the record in this case, it is apparent that there is nothing “unique and special” about the “facts and circumstances” of this that would warrant refusal to enforce the restrictive covenants, and that, by refusing to enforce this restrictive covenant against the Paolellas, the lower court has essentially invalidated the entire restrictive covenant scheme for this subdivision. Without knowing, I also suspect that the same rationale that justified refusal to enforce the restrictive covenant in this instance would apply equally to the vast majority of subdivisions in this state whose right to enforce their restrictive covenants would similarly be imperiled.
*378 I begin with the proposition that this particular restrictive covenant is clear and that the owners had ample constructive and actual notice of it. The setback requirement in a subdivision is both common and expected. Special notice of the existence of the restrictive covenants in this subdivision is given to a purchaser. It is also clear that the Paolellas had actual notice of the restrictive covenant burdening their property more than a week before any construction on their house was commenced. Assuming the lower court believed the contractor, Pastore, when he denied knowledge of the setback, I cannot credit as a “unique and special circumstance” the “my contractor is a dolt” defense. Although Mr. Pastore professed ignorance of the twenty-five foot setback, the record is clear that being informed of it had no effect at all on his behavior. The greatest irony in the lower court’s order is his reliance on Mr. Pas-tore’s testimony that he knew that setback violations were not always enforced in the Spring Hill subdivision because he himself had built his own home in violation of the setback requirements, and nobody had stopped him. The difference, of course, is that in building his own home, Mr. Pastore had furthermore not bothered to seek ARC approval of his plan. If he had, no doubt he would have learned about the twenty-five foot setback.
The whole point of the procedure whereby plans and site plans are submitted to an ARC for approval is to avoid exactly what occurred here. The purpose of the submittal is to let people know, in advance, what they may or may not build so that the surrounding property owners are not burdened with enforcement after the fact and so the homeowner does not have to endure uncertainty about whether he or she is in compliance with the restrictive covenants. The procedure worked as well as it could in this case: as soon as the site plan was submitted, the ARC promptly informed both the owner and the builder of the violation so that the violation would not occur.
The burden of a restrictive covenant is on the owner of the property and the burden of compliance with it is also with the owner. There is no doubt that construction in subdivisions without obtaining approval of the Architectural Review Committee (or even without obtaining county building permits) is a common occurrence. Homeowners’ associations are not police forces, however. Their resources and manpower are extremely limited in most cases and their ability to discern violations on the property of other people is necessarily circumscribed. Inaction by adjacent property owners and, where they exist, homeowners’ associations, does not invalidate a restrictive covenant simply by inconsistent enforcement. Rather, the restrictive covenant becomes unenforceable only where it is deemed to be abandoned, i.e. the failure to enforce the covenant has caused a change in the character of the neighborhood to the point where the restrictive covenant is no longer relevant to the community. Mizell v. Deal, 654 So.2d 659, 662 (Fla. 5th DCA 1995); Circle Square Co. v. Atlantis Dev. Co., 267 S.C. 618, 230 S.E.2d 704, 708 (1976). For example, if a restrictive covenant limits construction of single family homes in a subdivision to single-story homes, yet throughout the community two and three-story homes, have been constructed without complaint or enforcement, thus changing the character of the neighborhood that was intended to be protected by the one-story limitation, then that restrictive covenant is no longer enforceable. Such should be the standard by which lack of enforcement of a restrictive covenant will prevent the enforcement of a restrictive covenant. To say, however, that because a few other people, including Mr. Pastore, have “gotten away” with incursions on the setback otherwise consistently adhered to by most that the set back requirement can no longer be enforced against anyone would be a mistake. To allow unknowing — or even knowing lack of enforcement in a few instances to invalidate the restrictive covenants for front, side or rear setbacks would represent a serious mutation of the law of restrictive covenants.
A corollary to this “inconsistent enforcement” argument is the lower court’s conclusion that because the ARC has permitted, upon proper and timely request, certain setback deviations as being “minor,” this six-foot violation must also be excused as “minor.” In Wood v. Dozier, 464 So.2d 1168, *379 1170 (Fla.1985), the Supreme Court of Florida held that persons who purchased property cannot expect to have a covenant invalidated simply because the covenant has previously been violated and not enforced against others. In fact, this waiver theory, by virtue of certificates of nonenforcement, simply is not supported by the record. The record, in fact, indicates simply that in the other situations the deviations were less significant and were supported by genuine “unique circumstances.” The inconvenience to Paolella of possibly having to downsize their house or reconfigure its location on the lot is not a “unique circumstance” that obliges the SHCA to waive the six-foot setback violation as “minor.”
The other principal basis for refusing to grant the injunction is, to me, especially astonishing. After undertaking to assure that both the owner and the builder were given actual notice of the deed restrictions prior to the slab being poured and being ignored, the SHCA took the step of filing suit promptly on January 8, 1987. Yet, according to the appealed order, it was the SHCA’s failure to obtain a temporary injunction preventing the owners from building any further that estops enforcement in this case.[1] I have heard this excuse in many contexts during my tenure on the court. I have always called it the “stop me before I kill” defense. Here it is no more than a perversion of the laches defense.[2]
These homeowners were well and fully informed of the limitations on their rights, as owners, to build on their property. The setback was not an unreasonable restriction — it is a well recognized, almost universally utilized methodology to keep homes within a subdivision along uniform contours and to prevent construction of a home too large for the lot it occupies. Given the expense and the risk inherent in obtaining a temporary injunction, in my view, the burden should never be upon a plaintiff seeking to enforce a restrictive covenant to obtain a temporary injunction to prevent its knowing violation by the property owner in order not to lose the power of enforcement. See Europco Mgt. Co. v. Smith, 572 So.2d 963, 968-69 (Fla. 1st DCA 1990). To the contrary, if the Paolellas thought they had a perfect defense to enforcement of the restrictive covenant against them based on inconsistent enforcement against others, the burden should have been on the Paolellas to seek a declaratory judgment confirming their claimed right to be relieved of the duty to comply. Wood, 464 So.2d at 1169.
Given their limited time, limited resources and limited funds, the Spring Hill Civic Association has attempted to fulfill its responsibilities and to maintain the standards designed to govern the community. They should not have lost this case.
Having denied a mandatory injunction to SHCA, there remains a theoretical right to damages as a remedy for the Paolellas’ willful violation. The reason injunctive relief is available in such cases, however, is precisely because of the difficulty of arriving at a meaningful damages remedy. In Peters v. Davis, 426 Pa. 231, 231 A.2d 748, 752 (1967), a case with facts similar to this case, the Pennsylvania supreme court observed that the substitution of damages in cases like this will amount to an open invitation to others who are similarly inclined to ignore the restrictive covenants and to follow the same course followed by the Paolellas. What the Paolellas and others who will follow them have acquired unto themselves is a valuable property right — the ability to develop their property without the burden of the restrictive covenant. Simultaneously, all the other property owners in the subdivision have been deprived of their property right to protect *380 their property against inconsistent development. I acknowledge that enforcing this restrictive covenant against the Paolellas would have been hard on them. It would have been difficult for them before the house was built but devastating after it was built. But to build was a considered decision they made and a risk they decided to take. The doctrine of balancing of convenience does not apply in cases where the violation is knowing or wilful. Coral Gables Invs., Inc. v. Graham Companies, 528 So.2d 989, 990 (Fla. 3d DCA 1988); Daniel v. May, 143 So.2d 536, 537 (Fla. 2d DCA 1962). The law need not protect the Paolellas from their own recklessness. Hard cases make bad law, and I believe bad law has been made in this case.

. This defense, as described by appellee in its brief is as follows: "[T]he SHCA took action by filing a lawsuit, but failed to continue their enforcement action by seeking injunctive relief. The SCHA was requested to seek an injunction but the SHCA refused. The SCHA's delay allowed the home to be completed."

. The Pennsylvania Supreme Court was equally unimpressed with this argument in Peters v. Davis, 426 Pa. 231, 231 A.2d 748, 752 (1967), where they observed that the rationale of the lower court that the homeowners were “entitled only to damages rather than the removal of the offending portions of [the] dwelling from the restricted area because [the homeowners] should have prevented the completion of the building finds no support in the 'declaration,' in our case law or in the factual posture herein presented.”