629 S.E.2d 690

Douglas J. MENNE, as Trustee of the First Supplemental Trust Agreement created by Douglas J. Menne dated 11/22/96 (as amended), Appellant,

v.

KEOWEE KEY PROPERTY OWNERS' ASSOCIATION, INC., Respondent.

No. 4100.

Court of Appeals of South Carolina.

Heard March 7, 2006.
Decided April 3, 2006.
Rehearing Denied May 18, 2006.

558

Andrea Hawkins, of Spartanburg, and Christopher M. Kelly, of Greenville, for Appellant.

James B. Richardson, Jr., of Columbia, and Samuel F. Albergotti, of Anderson, for Respondent.

GOOLSBY, J.:

Douglas Menne brought this declaratory judgment action against the Keowee Key Property Owners' Association, Inc. seeking a determination regarding the validity of a restrictive covenant that prevents him from building an individual boat dock on his lakefront property. The master in equity ruled the covenant was valid and enforceable. Menne appeals. We affirm.

## FACTS

Keowee Key is a gated residential community on Lake Keowee. The community is divided into units, with each unit further divided into multiple lots. Keowee Key, a large area comprised of over 2,200 lots, covers approximately 1,600 acres. Each unit contains its own distinct set of restrictive covenants that apply only to the lots within that unit.

In 1985, Menne's mother purchased from the Lake Keowee Development Corporation Lot 24, a lakefront tract within Unit 20 of Keowee Key. Unit 20 abuts the largest cove at Lake Keowee, informally called the Leisure Trail Cove (the "Cove").

Menne's mother purchased the property subject to a restrictive covenant that the developer recorded in Oconee County on April 19, 1985. The covenant prohibits construction of individual boat docks in Unit 20 and provides in relevant part as follows:

No docks or other structures of a permanent or temporary nature shall be placed in or upon the waters or the shoreline of Lake Keowee by any individuals, partnership or corporation other than Lake Keowee Development Corporation, its successors or assigns.

The developer created the Leisure Trail, a walking path along the edge of the Cove at Lake Keowee, for the enjoyment of all Unit 20 property owners, including the owners of interior lots. The developer believed the natural aesthetics of the Leisure Trail would be better preserved by a few community boat docks, or "cluster docks," rather than numerous individual boat docks. The covenant maintains this appearance by preventing the construction of individual boat docks. In lieu of individual docks, however, Unit 20 property owners can lease boat slips from a nearby community boat dock, the Gazebo Dock.

At the time Menne's mother purchased Lot 24 in 1985, the Cove contained community docks in two locations, one consisting of 58 slips (the "Main Dock") and another consisting of the 18–slip Gazebo Dock, for a total of 76 slips. At one end of the Cove is Unit 21, which, like Unit 20, borders the Cove. At the other end of the Cove formerly stood the Yacht Club. It housed a restaurant and meeting area. The Leisure Trail started near the Yacht Club, traversed Unit 20, and ended within Unit 21.[1] From the time she bought the property, Menne's mother rented a boat slip at the Gazebo Dock.

In 2000, Menne took over ownership of Lot 24 from his mother subject to the covenant.[2] Menne admittedly knew when he acquired the property that the covenant prohibited Lot 24 from having an individual dock. He had accompanied his mother when she purchased the property in 1985. Menne also knew the covenant applied only to Unit 20 and did not apply to the other units in the Cove.

In 2001, Menne contacted the Keowee Key Property Owners' Association [3] and requested permission to build an individ-

---

1. Unit 21, which was undeveloped in 1985, has restrictive covenants that are similar, but not identical, to the Unit 20 restriction. Unit 21 borders and shares the Leisure Trail with Unit 20.

2. Menne's mother originally held title individually and later transferred title to the property to her revocable trust. Menne holds title as trustee for his revocable trust.

3. The Association is the successor to Realtec, Inc., the parent corporation of the Lake Keowee Development Corporation, which had originally deeded Lot 24 to Menne's mother.

ual boat dock on Lot 24 so he could house his three watercraft on the lake. Menne explained that, although he continued to lease one boat slip at the Gazebo Dock (as his mother had done), he wished to dock more boats at Lake Keowee because, in addition to his pontoon boat, he now owned a ski boat and jet ski used by his children. Menne complained about having to remove his watercraft from the lake on a daily basis. He said it cut into the amount of "water time" that he had on the lake. He viewed the Unit 20 restriction as "neither fair, logical or legal."

The Association rejected Menne's request based on the restrictive covenant in Unit 20. The Association noted no private docks existed in the restricted area and it was in the process of constructing additional community boat slips.[4]

Menne subsequently enlisted the help of an Ohio attorney to negotiate with the Association about building an individual dock on Lot 24. Menne met with the Association's general manager, David Coe, but the Association maintained its position that the Unit 20 covenant prevented Menne from constructing an individual boat dock on Lot 24.

Menne thereafter filed this declaratory judgment action seeking a determination that the Unit–20 covenant could no longer be enforced because of a change of conditions in the area. The master in equity reviewed the pleadings, stipulations, testimony, and exhibits, and walked the Leisure Trail with the consent of all parties, and concluded no radical change of conditions had occurred that would support an invalidation of the Unit 20 restrictive covenant regarding the construction of private docks. The master noted the Leisure Trail had retained its aesthetic appeal despite the addition of a few community docks in the Cove. Finally, the master ordered Menne to pay attorney fees and costs of $56,273.25 to the Association.

## LAW/ANALYSIS

### I. Change of Conditions

■ Menne contends the master erred in failing to invalidate the restrictive covenant based on a change of conditions.

---

4. Menne now leases two community boat slips from the Association, both of which are located at the Gazebo Dock near Menne's lot.

■ Under South Carolina law, a party may bring a declaratory judgment action to invalidate a restrictive covenant based on a change of conditions.[5] The party bringing the action bears the burden of proof by the preponderance of the evidence.[6]

■ In an action for a declaratory judgment, "affirmative relief may be granted against a restrictive covenant where there is such a change in the character of the neighborhood as to render the enforcement of the covenant valueless to the covenantee and oppressive and unreasonable as to the covenantor."[7] A party seeking to annul a restrictive covenant must show the change of conditions represented so radical a change that the original purpose of the restrictive covenant can no longer be realized.[8] Even if, however, a change of conditions has occurred and inflicts a hardship upon the servient estate, equity will enforce a restrictive covenant if it "remain[s] of substantial value."[9]

Since Menne's mother purchased Lot 24 in 1985, the Cove has changed. When she purchased Lot 24, the Cove contained 76 community boat slips—18 slips at the Gazebo Deck and 58 slips at the Main Dock. In 1992, the Association built a 24-slip cluster dock off the Leisure Trail, increasing the total number of boat slips to 100. Like the Gazebo Dock, this cluster dock accommodates property owners who could not build individual docks on the lake because they purchased property along the Leisure Trail. This particular cluster dock was built for Unit 21 property owners. In 1996, the Association added 12 slips to the Main Dock, increasing the total number of slips in the Cove to 112. In 2001, the Association

---

5. *Flinkingshelt v. Johnson,* 258 S.C. 77, 187 S.E.2d 233 (1972); *Dunlap v. Beaty,* 239 S.C. 196, 122 S.E.2d 9 (1961); *Martin v. Cantrell,* 225 S.C. 140, 81 S.E.2d 37 (1954).

6. *Martin,* 225 S.C. at 144, 81 S.E.2d at 38–39.

7. *Dunlap,* 239 S.C. at 210, 122 S.E.2d at 15.

8. *Inabinet v. Booe,* 262 S.C. 81, 202 S.E.2d 643 (1974); *Pitts v. Brown,* 215 S.C. 122, 54 S.E.2d 538 (1949); *Shipyard Property Owners' Ass'n v. Mangiaracina,* 307 S.C. 299, 414 S.E.2d 795 (Ct.App.1992).

9. *Circle Square Co. v. Atlantis Dev. Co.,* 267 S.C. 618, 630, 230 S.E.2d 704, 709 (1976).

built a 20–slip cluster dock off the Leisure Trail called the Tall Ships Dock. These additional slips, combined with the 2–slip Fordco Dock that had been in the Cove for an indeterminate number of years, brought the total number of slips near the Leisure Trail in the Cove to 134 overall.

The Association also has plans for future development. It has submitted an application to Duke Energy Corp. to build another cluster dock comprised of 14 slips next to the Main Dock at the beginning of the Leisure Trail.

The Yacht Club was razed and replaced with a town house development called Sunrise Pointe between 2001 and 2003. The developer of Sunrise Pointe built an 8–slip cluster dock and has already submitted a proposal to increase the dock to 12 slips. Sunrise Pointe is not located on the Leisure Trail and is not governed by the Association, but it is within the Cove. The old 2–slip Fordco Dock near the Sunrise Pointe property is slated to be removed, however.

The purpose of the Unit 20 covenant is to preserve the aesthetics of the Leisure Trail that runs along the Cove and crosses Unit 20. The developer believed prohibiting individual docks along the Unit 20 shoreline would best preserve the Leisure Trail. By building community docks, the Leisure Trail would remain open along the Unit 20 shoreline and Unit 20 property owners would still have access to the lake. To this end, the original purpose of the Unit 20 covenant can and continues to be realized.

As of this date, the Leisure Trail enjoys an open shoreline within Unit 20. No individual boat docks have been added to the Unit 20 shoreline and there have been no violations of the covenant since it was recorded. Although community docks have been built elsewhere in the Cove, no community docks have been added to the Unit 20 shoreline since Menne's mother purchased Lot 24. Consequently, there has been little change to the aesthetics of the Leisure Trail within Unit 20, let alone a radical change warranting the invalidation of the Unit 20 covenant at issue here.

Moreover, the Association's enforcement of the Unit 20 covenant is not oppressive to Menne. Because Menne currently leases two boat slips from the Association at the Gazebo Dock, two of his three watercraft are already housed on the

lake. Thus, even if there was a radical change of conditions within Unit 20, we do not believe the fact that Menne cannot house additional boats or other watercraft on the lake places such an exorbitant burden on him that the Unit 20 covenant should be invalidated.

## II. Evidence of Changes Outside the Restricted Area

Menne argues the master erred in failing to consider evidence of changed circumstances outside the restricted area.

■ To invalidate restrictive covenants based on a change of conditions, the changed conditions must occur within the restricted area, i.e., within the area where the covenants apply.[10] In *Flinkingshelt v. Johnson*,[11] our supreme court explained the relevant area must end somewhere and different conditions naturally will exist outside the restricted zone:

It is obvious that any restricted area, whether it be residential or industrial, must have a demarcation line; it must end somewhere. Where the restricted area ends, other unrestricted development will or may foreseeably occur. To hold that commercial development in an unrestricted area adjoining a restricted area would allow the lifting of the residential restrictions as to property adjoining or in the vicinity of the unrestricted area, would be to expose all restrictions to eventual invalidation. It would remove the sanctity of long standing, long respected contractual agreements and place them at the whim of parties not privy to the agreements.[12]

■ Here, Unit 20 is considered the restricted area because the covenant at issue applies only to the lots within Unit 20 and prohibits those lot owners from building individual boat docks on their property. The alleged change of conditions in the other units of the Cove is irrelevant to the determination of whether the Unit 20 covenant should be invalidated because of changed conditions.

---

**10.** *Flinkingshelt*, 258 S.C. at 87, 187 S.E.2d at 238; *see also Inabinet*, 262 S.C. at 83–84, 202 S.E.2d at 644–45; *Martin*, 225 S.C. at 147–48, 81 S.E.2d at 40–41.

**11.** 258 S.C. 77, 187 S.E.2d 233.

**12.** *Id.* at 87, 187 S.E.2d at 238.

## III. Alleged Ambiguity of the Restrictive Covenant

Menne asserts the master erred in concluding the language of the restrictive covenant is clear and unambiguous.

■ "[W]here the language imposing restrictions upon the use of property is unambiguous, the restrictions will be enforced according to their obvious meaning." [13]

■ The Unit 20 restrictive covenant provides as follows:

No docks or other structures of a permanent or temporary nature shall be placed in or upon the waters or the shoreline of Lake Keowee by any individuals, partnership or corporation other than Lake Keowee Development Corporation, its successors or assigns.

The Association is the successor of the Lake Keowee Development Corporation. Thus, the Association can build docks on Lake Keowee, while individual Unit 20 property owners, such as Menne, cannot. We conclude the language is clear and unambiguous.

## IV. Weight of the Testimony

Menne next contends the master erred in giving the testimony of his witness, real estate appraiser Luke Fields, less weight than the testimony of the Association's witness, local realtor Dan Suddeth, regarding the value of Menne's lakefront property with and without a dock.

■ "The credibility of testimony is a matter for the finder of fact to judge." [14] "Because the appellate court lacks the opportunity for direct observation of the witnesses, it should accord great deference to trial court findings where matters of credibility are involved." [15] Nothing in the record persuades us to overturn the master's view of the evidence.

---

13. *Mangiaracina*, 307 S.C. at 308, 414 S.E.2d at 801; *see also Harvey v. Marsh Hawk Plantation*, 310 S.C. 355, 356, 426 S.E.2d 792, 793 (1993) ("An unambiguous covenant will be enforced according to its obvious meaning.").

14. *South Carolina Dep't of Soc. Servs. v. Forrester*, 282 S.C. 512, 516, 320 S.E.2d 39, 42 (Ct.App.1984).

15. *Id.*

■ Moreover, we find no error in the master's determination that, even if Menne's lot would be worth more with an individual dock, this would not justify the invalidation of the restrictive covenant where there is no radical change in the restricted area and the covenant still retains substantial value to the residential community.

## V. Complaints by Other Residents

Menne argues the master erred in excluding evidence of other residents' complaints about the addition of more community docks within the Cove.

■ The admission or exclusion of evidence is within the sound discretion of the trial court, whose ruling will not be reversed on appeal absent an abuse of discretion.[16] "An abuse of discretion occurs when the ruling is based on an error of law or a factual conclusion that is without evidentiary support."[17] "To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice...."[18]

■ Menne offered several letters from Unit 21 property owners who objected to the addition of boat slips to the Unit 21 community dock, a dock that lies outside the restricted area. Menne argued the letters showed the Association had notice of changed conditions due to continued expansion within the Cove. The master excluded the letters as hearsay and irrelevant. We find no abuse of discretion in this instance. The only pertinent evidence of changed conditions is of those changes occurring within the restricted area, i.e., Unit 20.

## VI. Motion to Amend the Pleadings

Menne asserts the master erred in denying his motion to amend his pleadings to include causes of action for misrepresentation and estoppel.

---

16. *Fields v. Reg'l Med. Ctr. Orangeburg*, 363 S.C. 19, 609 S.E.2d 506 (2005).

17. *Id.* at 26, 609 S.E.2d at 509.

18. *Id.*

██ The master denied Menne's motion under Rule 15(b), SCRCP to amend his pleadings to conform to the evidence, finding the evidence had not established either cause of action. Menne argued the Association had represented Keowee Key as being a complete community that was already developed. He further argued the covenant prohibited the addition of any docks, even by the Association. Menne's interpretation of the covenant is clearly not supported by the evidence. Moreover, because Menne admitted the Association never told him that additional community docks would not be built within Unit 20 or elsewhere in the Cove, there is no evidence establishing either misrepresentation or equitable estoppel.[19]

## VII. Attorney Fees

Menne lastly argues the master erred in ordering him to pay $56,273.25 in attorney fees and costs to the Association.

 As a general rule, a party may not recover attorney fees absent a contract or statute.[20] "When there is a contract, the award of attorney[ ] fees is left to the discretion of the trial judge and will not be disturbed unless an abuse of discretion is shown." [21]

██ "There are six factors to consider in determining an award of attorney[ ] fees: 1) nature, extent, and difficulty of the legal services rendered; 2) time and labor devoted to the case; 3) professional standing of counsel; 4) contingency of compensation; 5) fee customarily charged in the locality for similar services; and 6) beneficial results obtained." [22] An award of attorney fees will be affirmed on appeal if there is sufficient evidentiary support in the record for each factor.[23]

---

**19.** *See Harvey v. Strickland,* 350 S.C. 303, 313, 566 S.E.2d 529, 535 (2002) ("A motion to amend is addressed to the sound discretion of the trial court, and the party opposing the motion has the burden of establishing prejudice.").

**20.** *Blumberg v. Nealco, Inc.,* 310 S.C. 492, 493, 427 S.E.2d 659, 660 (1993).

**21.** *Id.*

**22.** *Id.* at 494, 427 S.E.2d at 660.

**23.** *Id.* at 494, 427 S.E.2d at 661.

██ In this case, the "Amended and Restated Declaration of Protective Covenants of Keowee Key" [24] authorize the Association to recover attorney fees in the event it is successful in the defense of the provisions of the Declaration.[25] The master thoroughly examined the factors that determine an award of attorney fees and concluded the evidence supported an award of $56,273.25 to the Association. The record fully supports the master's findings.

AFFIRMED.

HUFF and STILWELL, JJ., concur.

---

**24.** The Declaration provides: "Declarant and each person to whose benefit this Declaration inures may proceed at law or in equity to maintain any action for the enforcement or defense of any provisions of this Declaration, and if such party is successful, shall be entitled to recover reasonable expenses, including attorney[ ] fees."

**25.** *See, e.g., Seabrook Island Property Owners' Ass'n v. Berger,* 365 S.C. 234, 239, 616 S.E.2d 431, 434 (Ct.App.2005) ("Restrictive covenants are contractual in nature.").